**UNITED STATES, Appellee,**

v.

**Gary Wayne JACKMAN, Appellant.**

**No. 94–1759.**

United States Court of Appeals,
First Circuit.

Heard Dec. 9, 1994.

Decided Feb. 9, 1995.

Miriam Conrad, Federal Public Defender, Boston, MA, for appellant.

Robert E. Richardson, Asst. U.S. Atty., with whom Donald K. Stern, U.S. Atty., Boston, MA, was on brief for appellee.

Before SELYA, Circuit Judge, BOWNES, Senior Circuit Judge, and STAHL, Circuit Judge.

STAHL, Circuit Judge.

In this appeal of his conviction for bank robbery, defendant-appellant Gary W. Jackman alleges an abuse of discretion in certain of the district court's evidentiary rulings. Finding no abuse of discretion, we affirm.

## I.

### BACKGROUND

On December 24, 1992, a man wearing a Florida Marlins baseball cap and a bulky winter jacket walked into the Boston Five Cents Savings Bank in Revere, Massachusetts, handed teller Deanna Megna a note demanding money, stating he had a gun, and walked out after being given $1,740 from the teller's drawer. Megna described the man immediately after the robbery as "skinny" and "blond." About a month later, Megna easily picked Jackman as the Revere robber out of a six-man lineup in Glastonbury, Connecticut, where Jackman was being held in connection with a bank robbery in Avon, Connecticut. Photographs of the Revere robber, taken by the bank's surveillance camera, were shown by investigators to Jackman's ex-wife, Deborah Jackman, and to two acquaintances of Jackman, Harry Stetson and David Hurlock. Although the photographs showed only part of the robber's face beneath a baseball cap and were somewhat grainy, Deborah Jackman, Stetson and Hurlock all told investigators that the man in the photographs was Jackman. Prior to identifying Jackman as the man in the Revere robbery photos, Deborah Jackman, Stetson and Hurlock all viewed a much clearer photograph of the Connecticut robber taken during the course of that robbery and identified the robber as Jackman. Both the Connecticut robber and the Revere robber appear to be wearing a Florida Marlins baseball cap and a heavy winter coat.

At trial, Megna testified about the robbery and her identification of Jackman at the lineup, but she was unable to make an in-court identification of Jackman.[1] James Genco,

---

1. The jury also heard testimony that none of the fingerprints found on the note handed to Megna matched those of Jackman. Megna testified that she did not notice whether the robber was wearing gloves, and a fingerprint expert testified that extremely cold hands might not leave any finger-prints on a note. A National Weather Service employee testified at Jackman's trial that the temperature at Logan Airport around the time of the Revere robbery was thirty degrees Fahrenheit, with an equivalent windchill temperature of minus four degrees.

the Assistant United States Attorney who prosecuted Jackman in Connecticut and who oversaw the Glastonbury lineup (which was viewed by witnesses to both the Revere and Connecticut bank robberies), testified about the composition of the lineup and Megna's identification of Jackman as the Revere robber. The district court warned the government to advise Genco not to make any references to the fact that he was a federal prosecutor from Connecticut and not Massachusetts, or that Jackman had been tried and convicted of another bank robbery. Nevertheless, the following colloquy took place as the prosecutor questioned Genco on direct examination about the Glastonbury lineup:

Q. Could you tell—give the jury a general description of those six individuals [in the lineup]?

A. They were all basically selected because they fit the description of the robber. They were white males—

Ms. Conrad: Objection.

A. —with mustaches.

The court: Overruled.

A. They were all white males with mustaches and approximately the same color of hair that we had described to us.

Conrad, Jackman's attorney, objected again, was overruled, and subsequently moved for a mistrial. On the videotape of the lineup shown to the jury, the six men appeared to have brown or darker hair; Megna had already testified that immediately after the robbery she had described the robber as having blond hair. Thus, Conrad argued, the jury could easily have inferred either that Megna or someone else had provided authorities with another description of the Revere robber as having darker hair, or, more sinister, that Genco arranged the lineup based on a description provided in another robbery altogether, and that Jackman was a suspect in that robbery as well. The court denied Jackman's motion for a mistrial, but it instructed the jury "to disregard any of the testimony of this witness with respect to the description of the individual and how this witness went about choosing the other members of the lineup. That evidence has been stricken and you're not to consider it."

Deborah Jackman, Stetson and Hurlock also testified at trial, offering their opinions as to the identity of the man in the Revere robbery photographs as is sometimes permitted under Fed.R.Evid. 701, which allows non-expert opinion testimony under certain conditions.

Deborah Jackman testified that she had known Jackman since 1972 and was married to him from 1976 until 1990 (the couple separated in 1988). After the couple separated, she continued to see Jackman every other weekend when Jackman, exercising his visitation rights, would pick up and return their children. She testified that Jackman had worn a dirty-blond mustache for many years, that he wore baseball caps, and that the coat worn by the Revere robber in the photographs was similar to one worn by Jackman before the couple separated. She told the jury that she recognized the man in the surveillance photographs as her ex-husband, and answered in the negative when asked if there was any doubt in her mind that it was he.

Hurlock testified that he had known Jackman since 1986, when Jackman lived in Unionville, Connecticut. Hurlock told the jury that Jackman was an occasional customer at his convenience store, that both he and Jackman were involved in coaching youth baseball teams from 1987 until 1990, and that in late 1990, Jackman came to his store wearing a bulky jacket not unlike that pictured in the Revere robbery photographs to discuss the possibility of coaching youth basketball. He also testified that Jackman wore a baseball cap the vast majority of the times he had seen him. Hurlock told the jury that he recognized the man in the surveillance photographs as Jackman.

Stetson testified that he had known Jackman since 1985 when Jackman and his former wife moved next door to him. In 1989, after the Jackmans separated, Jackman lived with Stetson for about six months and Stetson continued to see Jackman occasionally until November 1991. Stetson, too, told the jury that he recognized the man pictured in the surveillance photographs and had no doubt that the man was Jackman.

The jury also heard testimony from John Jackman, the defendant's brother. He testified that, in his opinion, the man in the surveillance photographs was *not* his brother, and he pointed out to the jury what he thought were features distinguishing his brother from the man in the picture.

The jury convicted Jackman of one count of bank robbery, 18 U.S.C. § 2113(a). Jackman raises several issues on appeal. He contends that the testimony of Deborah Jackman, Stetson and Hurlock should have been excluded because it was not helpful to the jury, it was not susceptible to cross-examination, and it presented dangers of unfair prejudice that substantially outweighed its probative value. Jackman also argues that the district court committed reversible error by allowing Genco to testify at all, as well as by refusing to grant a mistrial after Genco alluded to a description of the robber not provided by anyone who testified in the case. We address each of these arguments in turn.

## II.

### DISCUSSION

A. *Admissibility of Lay Opinion Testimony*

■ We review a district court's admission of lay opinion testimony under Fed.R.Evid.

701 for manifest abuse of discretion. *Keller v. United States*, 38 F.3d 16, 31 (1st Cir. 1994); *United States v. Paiva*, 892 F.2d 148, 156 (1st Cir.1989).

### 1. *Helpfulness*

Rule 701 allows for the admission of lay opinion testimony only if the testimony is "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." Jackman challenges the admission of the testimony of his ex-wife, Hurlock and Stetson under the second prong of Rule 701, arguing that the jury was in as good a position as these three witnesses to compare the surveillance photographs to Jackman, and that therefore their testimony was not helpful.

■ The admissibility of opinion testimony identifying a defendant from surveillance photographs is an issue of first impression for this Circuit. A number of other circuits, however, have ruled in a variety of circumstances that such testimony may indeed be helpful to the jury and is therefore admissible in the trial court's discretion.[2] We agree that such testimony is admissible, at least when the witness possesses sufficiently relevant familiarity with the defen-

---

2. *See, e.g., United States v. Maddox*, 944 F.2d 1223, 1230–31 (6th Cir.) (testimony by police officer identifying defendant in photograph seized in raid of drug house helpful despite absence of prior contacts or other circumstances giving witness advantage in evaluating photograph; jury is free to assess credibility of such testimony), *cert. denied*, 502 U.S. 950, 992, 112 S.Ct. 400, 610, 116 L.Ed.2d 349, 633 (1991), 502 U.S. 1063, 1113, 112 S.Ct. 948, 1219, 117 L.Ed.2d 117, 456, — U.S. —, 112 S.Ct. 1978, 118 L.Ed.2d 577, — U.S. —, 112 S.Ct. 2317, 119 L.Ed.2d 236 (1992), *amended sub nom. United States v. Arnold*, 12 F.3d 599 (6th Cir.1993), *cert. denied*, — U.S. —, 114 S.Ct. 1328, 127 L.Ed.2d 675 (1994); *United States v. Stormer*, 938 F.2d 759, 762 (7th Cir.1991) (four police officers' testimony identifying former police officer as robber in surveillance photographs helpful where officers had worked with defendant for several years, photographs were of poor quality and robber wore baseball cap and hosiery pulled over face); *United States v. Wright*, 904 F.2d 403, 404–05 (8th Cir.1990) (identification of defendant in bank surveillance photograph by law enforcement officers and bail bondsman who

had known defendant for periods ranging from two to thirteen years admissible where photograph showed partially obscured face of robber and defendant had grown slight beard since time of robbery); *United States v. Langford*, 802 F.2d 1176, 1179 (9th Cir.1986) (testimony of defendant's cousin and parole officer identifying defendant in bank surveillance photographs helpful because parole officer had met with defendant about 50 times and cousin had known defendant most of his life); *United States v. Allen*, 787 F.2d 933, 936 (4th Cir.1986) (identification of defendants in bank surveillance photographs by police officer and parole officer familiar with defendants "especially helpful" where photographs depict only parts of robbers' faces), *vacated on other grounds*, 479 U.S. 1077, 107 S.Ct. 1271, 94 L.Ed.2d 132 (1987); *United States v. Borrelli*, 621 F.2d 1092, 1095 (10th Cir.) (stepfather's identification of defendant from photograph helpful because stepfather had knowledge of defendant's appearance both before and at time of robbery and defendant had grown moustache and changed hairstyle since time of robbery), *cert. denied*, 449 U.S. 956, 101 S.Ct. 365, 66 L.Ed.2d 222 (1980).

dant that the jury cannot also possess, and when the photographs are not either so unmistakably clear or so hopelessly obscure that the witness is no better-suited than the jury to make the identification. *See United States v. Farnsworth,* 729 F.2d 1158, 1160 (8th Cir.1984) ("A witness's opinion concerning the identity of a person depicted in a surveillance photograph is admissible if there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph than is the jury."); *cf. United States v. LaPierre,* 998 F.2d 1460, 1465 (9th Cir.1993) (excluding opinion testimony by investigating police officer identifying defendant in surveillance photograph because defendant's appearance had not changed between time of robbery and trial and officer had never seen defendant before in person).[3] Familiarity with the defendant's appearance at the time the crime was committed would be relevant; so, too, would familiarity with the defendant in clothing similar to that worn by the person in the photograph at issue, or general familiarity with the defendant's appearance acquired over a period of time and in a variety of contexts. As the Fourth Circuit has stated:

> [T]estimony by those who knew defendants over a period of time and in a variety of circumstances offers to the jury a perspective it could not acquire in its limited exposure to defendants. Human features develop in the mind's eye over time. These witnesses had interacted with defendants in a way the jury could not, and in natural settings that gave them a greater appreciation of defendants' normal appearance. Thus, their testimony provided the jury with the opinion of those whose exposure was not limited to three days in a sterile courtroom setting.

*United States v. Allen,* 787 F.2d 933, 936 (4th Cir.1986), *vacated on the grounds,* 479 U.S. 1077, 107 S.Ct. 1271, 94 L.Ed.2d 132 (1987).

■ Under these standards, the district court's admission of the testimony of Deborah Jackman, Hurlock and Stetson did not constitute an abuse of discretion. All the surveillance photographs of the Revere robber are somewhat blurred, and they show only part of the robber's face, primarily the left side from eye-level down. Furthermore, although the record does not indicate how Jackman dressed at trial, it is virtually certain that he did not appear each day wearing a bulky winter jacket and a baseball cap pulled down low over his forehead.[4] Thus, because the jury was only able to compare the grainy photographs of the Revere robber with Jackman as he appeared at trial and in the videotaped lineup, the identification by the three witnesses conceivably was of help to the jury.

Deborah Jackman, Hurlock and Stetson testified that they had known the defendant for extended periods of time and had seen him on multiple occasions under a variety of circumstances. Each had seen the defendant numerous times wearing a baseball cap. Deborah Jackman and Hurlock had seen him wearing a coat that resembled the coat worn by the robber. While it is true that neither Hurlock nor Stetson had seen the defendant for at least several months before the Revere robbery, and thus could not testify that they were familiar with the defendant's appearance at the precise time of the robbery, this potential weakness in their testimony did not render it inadmissible and was highlighted on cross-examination and in defense counsel's closing argument. The fact remains that all three witnesses had far more opportunity than the jury to perceive Jackman from a

---

**3.** The Seventh Circuit has deemed "helpful" testimony by a witness who had seen the defendant on a single social occasion and nearly a year prior to identifying him in a bank surveillance photograph, even without evidence of a change in the defendant's appearance, on the theory that, when shown the photograph, the witness could "compare the person in the bank surveillance photograph with every person she had ever met, whereas the jury could only compare the person in the surveillance photographs to the defendant." *United States v. Jackson,* 688 F.2d 1121, 1125 (7th Cir.1982). The case at hand does not present us with facts as extreme as those in *Jackson,* and we express no opinion on how we would rule in a similar case.

**4.** The jurors were able to view Jackman wearing a baseball cap on the videotaped lineup and during a short courtroom demonstration that the prosecution requested. These brief views in unnatural settings did not make the three witnesses' testimony unhelpful.

variety of angles and distances and under different lighting conditions. Unlike the jury, they were familiar with the defendant's carriage and posture. In sum, the witnesses' testimony was helpful to the jury and did not constitute "meaningless assertions which amount to little more than choosing up sides." Fed.R.Evid. 701 advisory committee's note.

### 2. *Availability of Cross–Examination*

■ Jackman next contends that because he could not fully cross-examine Deborah Jackman, Hurlock and Stetson, their testimony should have been excluded under Fed. R.Evid. 701 and Fed.R.Evid. 403. Specifically, Jackman argues that because the district court had already ruled that evidence of the Connecticut robbery was unduly prejudicial and off-limits, he could not inquire about the effect the witnesses' viewing of the Connecticut robbery photograph had on their subsequent identification of him in the Revere photographs. The court's ruling, however, could not possibly be construed as meaning that the *defendant* could not elicit testimony related to the Connecticut bank robbery on cross-examination. Defendants are often confronted with witnesses who possess knowledge of the defendant's past criminal history, knowledge that cannot be introduced by the prosecution. Although such knowledge could potentially be a source of bias infecting the witness's testimony, we know of no evidentiary doctrine that would ordinarily exclude such testimony simply because cross-examination by the defendant about that knowledge could be highly damaging to his case. Thus, Jackman's failure to cross-examine these witnesses on this issue was not ordained by the court, but was instead a tactical decision. *See Wright*, 904 F.2d at 406 (defendant's decision not to cross-examine law enforcement officers for bias was tactical decision); *Allen*, 787 F.2d at 937 (failure to cross-examine law enforcement officers on bias was "a tactical choice by defendants similar to those frequently faced at trial"). *But see United States v. Calhoun*,

544 F.2d 291, 296–97 (6th Cir.1976) (defendant's failure to cross-examine probation officer on possible bias was not waiver of right to cross-examine because "the choice given is not real, and amounts to a choice between the rock and the whirlpool" (internal quotation omitted)).

■ Jackman urges us to adopt the reasoning of the Sixth Circuit in *Calhoun*, in which the court ruled inadmissible identification testimony by a defendant's probation officer because of the unfairly prejudicial evidence the jury would have heard had the defendant cross-examined the witness on his possible biases. *Id.* at 296. It is true that we have stated that the admission of lay opinion evidence is favored "provided it is well founded on personal knowledge and susceptible to cross-examination." *United States v. Paiva*, 892 F.2d 148, 157 (1st Cir. 1989). Furthermore, the advisory committee's note to Rule 701 makes clear that the rule's justification relies in part on "the natural characteristics of the adversary system" and the fact that "cross-examination and argument will point up the weakness" of broadly asserted opinion testimony. Thus, there may be cases in which these safeguards are absent to such an extent that to admit the opinion testimony would constitute an abuse of discretion. To the extent that *Calhoun* may be read as imposing a ban on identification testimony by non-percipient witnesses who may possess biases that cannot be fully explored on cross-examination without exposing a defendant's prior criminal history, we decline to follow that case. We believe that a better reading of *Calhoun* limits its application to those cases in which a non-percipient identification witness's only encounters with the defendant involved his criminal past, and thus the defendant's possible avenues of "safe" cross-examination are so limited that the testimony might not carry the adversarial safeguards assumed by the drafters of Rule 701.[5] This is not such a case.

All three of the opinion witnesses had extensive contacts with Jackman prior to, and

---

5. In reading *Calhoun* in this way, we simply mean to state that we believe it was this logic, and not a per se exclusion, that informed the Sixth Circuit's decision. We leave for another

day whether if presented with facts similar to those in *Calhoun*, we would rule as the Sixth Circuit did.

wholly separate from, their having viewed the Connecticut robbery photograph. Thus, Jackman's possible avenues of "safe" cross-examination were manifold, and his counsel quite effectively traveled down several of them, exposing Deborah Jackman's potential biases against her ex-spouse, Hurlock's comparatively infrequent contacts with the defendant, and Stetson's reliance on medication for depression and anxiety, which he failed to take the morning he first identified Jackman in the Revere robbery photographs. The single area of cross-examination that Jackman could not explore without the potential of opening up his prior criminal history was the possible bias caused by the witnesses' prior viewing of the Connecticut robbery photograph. This "limitation" on Jackman's cross-examination was of the defendant's own choosing and was insufficient to make the opinion testimony inadmissible under Rule 701 or Rule 403.

### 3. *The Need for an Evidentiary Hearing*

■ For reasons similar to those expressed in Part II.A.2, *supra*, we reject Jackman's argument that the district court's failure to grant him an opportunity to question the opinion witnesses outside the presence of the jury constituted an abuse of discretion. While granting Jackman that opportunity, at least in the form of voir dire if not a full evidentiary hearing, might have been "eminently sensible," *see Nassar v. Vinzant*, 519 F.2d 798, 802 n. 4 (1st Cir.), *cert. denied*, 423 U.S. 898, 96 S.Ct. 202, 46 L.Ed.2d 132 (1975), and under some circumstances perhaps necessary, *see, e.g., United States v. Stormer*, 938 F.2d 759, 763 (7th Cir.1991) (identification testimony by police officers admissible where extensive examination conducted outside presence of jury), again, this is not such a case. The opinion witnesses had extensive familiarity with Jackman wholly distinct from his criminal history and were familiar with his appearance in a baseball cap and a heavy winter jacket. The district judge had both the Connecticut robbery photo and the Revere robbery photos before him; his decision that under these circumstances, a hearing was unnecessary to determine whether Deborah Jackman's, Stetson's or Hurlock's subsequent identification of Jackman as the Revere robber was impermissibly tainted, was well within his discretion.[6]

### 4. *Implicit Bad Character Evidence*

■ We also reject Jackman's argument that the opinion testimony should have been excluded under Rule 403 because it constituted "implicit" bad character evidence. Because the witnesses knew Jackman well and testified that they had "no doubt" that the man in the Revere photograph was Jackman, so this argument goes, the jury would conclude that these witnesses must have had other reasons to believe that Jackman was the kind of man who would commit a bank robbery. The witnesses, however, never testified about or alluded to any such reasons. Indeed, Stetson and Hurlock testified about Jackman's involvement in Little League and other youth sports. If their testimony did create any unfair prejudice of this type, it is certainly not clear that it substantially outweighed the testimony's probative value such that the district court abused its discretion in admitting it.

### B. *Genco's Testimony*

Jackman's final arguments are that the district court abused its discretion, first in permitting the Connecticut prosecutor Genco to testify about the lineup in which Megna identified Jackman as the Revere robber, and then in refusing to grant a mistrial when Genco alluded to a description the government apparently obtained in investigating the Connecticut robbery. Neither point merits extensive discussion.

■ Genco only identified himself as an Assistant United States Attorney; no mention was made of the fact that he lived and

---

**6.** Jackman also argues that he must have a new trial because the district court failed to make specific findings that the opinion witnesses' testimony met the requirements of Rule 701 and gave no indication that it had weighed the potential prejudice presented by the testimony against its probative value, as required by Rule 403. We reject these arguments as meritless, as there is ample support in the record for the district court's implicit conclusion that the testimony at issue met the requirements of both these rules.

worked in Connecticut. His testimony was offered to authenticate the videotape of the lineup, to explain how it was arranged and to identify for the jury the points on the videotape at which Megna entered and exited the viewing room. This testimony, the government contends, enabled it to argue in closing that Megna needed little time in the viewing room before identifying Jackman. Jackman offered to stipulate to the videotape's authenticity, but no offer was made to stipulate to the other aspects of Genco's testimony. While the testimony might have been of marginal utility, it was not wholly cumulative or overly lengthy, and its admission did not constitute an abuse of discretion.

As for Genco's "slip" concerning a description of "the robber" that did not comport with the description provided by Megna, a mistrial was not called for. The reference was allusive enough and the curative instruction sufficient such that we seriously doubt that the jury was able to draw any inference damaging to Jackman based on Genco's blunder. *See United States v. Sepulveda*, 15 F.3d 1161, 1184 (1st Cir.1993) ("Declaring a mistrial is a last resort, only to be implemented ... if the trial judge believes that the jury's exposure to the evidence is likely to prove beyond realistic hope of repair."), *cert. denied*, — U.S. ——, 114 S.Ct. 2714, 129 L.Ed.2d 840 (1994).

***Affirmed.***