COURT OF APPEALS OF VIRGINIA

Present:   Judges Fulton, Friedman and Chaney
Argued at Norfolk, Virginia

**PUBLISHED**

SH'KISE FAZION CAPPE

v.        Record No. 1161-22-1

COMMONWEALTH OF VIRGINIA

OPINION BY
JUDGE FRANK K. FRIEDMAN
JANUARY 16, 2024

FROM THE CIRCUIT COURT OF THE CITY OF NEWPORT NEWS
Christopher R. Papile, Judge

Charles E. Haden for appellant.

Elizabeth Kiernan Fitzgerald, Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.


Sh'Kise Cappe was convicted by a Newport News jury of first-degree murder, conspiracy

to commit first-degree murder, and use of a firearm in the commission of a felony.  On appeal,

Cappe alleges that the trial court erred in denying his motion to strike the evidence and in

excluding lay witness opinion testimony that the person depicted in a surveillance video was not

Cappe, i.e., "non-identification" testimony.

We find that lay opinion testimony that a certain person is not depicted in a video or

photograph is admissible where the evidence is relevant and (1) is based on the witness' personal

knowledge and familiarity with the subject, and (2) will aid the trier of fact in understanding the

witness' perceptions.  However, we further find that the trial court's exclusion of such testimony

in this case was harmless error and that the record was sufficient to sustain Cappe's convictions.

BACKGROUND

"In accordance with familiar principles of appellate review, the facts will be stated in the light most favorable to the Commonwealth, the prevailing party [below]." *Poole v. Commonwealth*, 73 Va. App. 357, 360 (2021) (quoting *Gerald v. Commonwealth*, 295 Va. 469, 472 (2018)).  Around 11:35 p.m. on April 17, 2020, surveillance cameras recorded three armed men exit a sedan in the parking lot of an apartment complex.  The men approached the victim, Stephen White, and shot him to death before fleeing.[1]  White was shot "at least" 14 times.  Police later found three types of cartridge casings in the parking lot, including 17 7.62x39 caliber cartridge casings.

After reviewing surveillance video footage from the apartment complex, the police released a photo of the three suspects to local news outlets, including local Channel 10.  The photo was released on April 21, 2020.  The same day—shortly after Channel 10 ran the photo—Cappe's phone revealed the following text exchange:

> CAPPE: [Redacted] get low[2]
>
> RESPONSE: Why you say that
>
> CAPPE: Check 10

---

[1] The video shows that the men arrived in the same vehicle, walked through the apartment complex together, confronted the victim together, and opened fire simultaneously. After the victim fell to the ground, two of the men ran away.  The man alleged to be Cappe walked closer to the victim, shot him several more times, then turned and ran in the same direction as his colleagues.  Eventually he caught up with the other men and all three departed together.  The apartment complex surveillance video is somewhat grainy—the events were filmed outdoors just before midnight.

[2] The trial court redacted this text message for the jury.

RESPONSE: I seen it wtf mane fuck get rid of everything ASAP

CAPPE: Shits gone[3]

After the photo was released, police received a tip that led them to a home in Hampton, where they found a vehicle matching the vehicle driven by the suspects. That vehicle was registered to Cappe. Police eventually searched that vehicle and found identifying information belonging to Cappe, as well as a 7.62x39 cartridge case and a copper bullet jacket fragment. At trial, an expert witness testified that the 7.62x39 cartridge case found in Cappe's vehicle was fired by the same gun that left the 7.62x39 cartridge cases at the murder scene. That gun was never recovered.

Cell tower records from the night of the shooting revealed that Cappe's phone traveled toward the crime scene, along with another phone ("Cell Phone B"). Eventually Cappe's phone died or was turned off and its movements could not be tracked, but Cell Phone B arrived at the crime scene around 11:20 p.m. that night. Two minutes later, at 11:22 p.m., Cell Phone B called Cappe's phone, which was still off. At 11:31 p.m., Cell Phone B interacted with the victim's phone. The victim was shot at approximately 11:37 p.m.

Police arrested Cappe and charged him with first-degree murder, conspiring to commit first-degree murder, and using a firearm in the commission of a felony.

At trial, Cappe moved to exclude a detective's opinion that Cappe was one of the shooters depicted in the surveillance videos. At a hearing on the motion, Newport News Police Detective Michael Scrimgeour testified that he reviewed the surveillance videos of the incident and compared them to images of Cappe from a social media account. Additionally, although he did not interact with Cappe before the incident, the detective recognized him because he

---

[3] This text was sent two hours after the previous text. The court redacted several other messages sent and received during that time between these two phone numbers, finding them irrelevant.

interviewed Cappe after arresting him in May 2020 and watched him in court. Based on the above circumstances, Detective Scrimgeour opined that Cappe was one of the perpetrators depicted in the surveillance videos.

Cappe argued that Detective Scrimgeour was not qualified to offer an expert opinion identifying him in the surveillance videos because the detective did not have specialized training in "facial recognition." Additionally, acknowledging that under *Bowman v. Commonwealth*, 30 Va. App. 298 (1999), a witness may offer a lay opinion regarding the accused's identity as an individual depicted in a video, Cappe maintained that the detective was not sufficiently familiar with him to do so. The Commonwealth conceded that Detective Scrimgeour was not qualified to offer an expert opinion regarding Cappe's identity as one of the individuals depicted in the videos but maintained that the detective could offer a lay opinion on the subject. Following argument, the trial court ruled that the detective's opinion was inadmissible.

Later during trial, the Commonwealth moved to prevent a defense witness from opining that the surveillance videos did *not* depict Cappe. During a hearing on the motion, Lakesha Kirkendall testified that she had known Cappe "[s]ince he was born," was friends with his mother, and regularly visited them "every other week" until about January 15, 2020, when she last saw Cappe before his arrest. Kirkendall testified that she had reviewed the surveillance videos and opined that they did not depict Cappe. She explained that the man shown in the surveillance images did not share Cappe's "facial features," including his "very strong lips" and "round head," nor did the man appear to have braided hair, as Cappe did when she last saw him in January. In addition, the man depicted seemed "a lot smaller" than Cappe.

The Commonwealth argued that Kirkendall's opinion was inadmissible because she was not familiar with Cappe's appearance on the date of the shooting. Additionally, the Commonwealth contended that *Bowman*'s holding did not apply to "non-identification[s]," and,

- 4 -

therefore, Kirkendall's opinion that Cappe was not depicted in the videos was irrelevant. Cappe countered that *Bowman* applies broadly to all lay opinion identification testimony, whether inculpatory or exculpatory, and that Kirkendall was sufficiently familiar with Cappe to opine that he was not depicted in the videos. The trial court held that *Bowman* only applied to lay opinion testimony "identify[ing] a defendant," but not the "converse," which involves a "different analysis." Further, the trial court found that "non-identification" testimony was not "reliable." Accordingly, the trial court ruled that Kirkendall's opinion was inadmissible.

At the close of the Commonwealth's evidence and, again, at the conclusion of all the evidence, Cappe moved to strike each of his charges. The trial court denied the motion. The jury subsequently convicted Cappe of first-degree murder, conspiring to commit first-degree murder, and using a firearm in the commission of a felony. This appeal followed.

## ANALYSIS

### I. Sufficiency of the Evidence

Cappe's first assignment of error alleges that the trial court erred in denying his motion to strike each of his charges. "When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Id.* (alteration in original) (quoting *Secret v. Commonwealth*, 296 Va. 204, 228 (2018)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted

to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan*, 72 Va. App. at 521 (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

### A. Murder and Use of a Firearm

First-degree murder includes "any willful, deliberate, and premeditated killing." Code § 18.2-32. "To premeditate means to adopt a specific intent to kill, and that is what distinguishes first and second degree murder." *Betancourt v. Commonwealth*, 26 Va. App. 363, 372 (1998) (quoting *Rhodes v. Commonwealth*, 238 Va. 480, 485 (1989)). "To prove premeditated murder, the Commonwealth must establish: (1) a killing; (2) a reasoning process antecedent to the act of killing, resulting in the formation of a specific intent to kill; and (3) the performance of that act with malicious intent." *Id.* at 372-73 (quoting *Archie v. Commonwealth*, 14 Va. App. 684, 689 (1992)). "Premeditation and formation of an intent to kill seldom can be proved by direct evidence. A combination of circumstantial factors may be sufficient." *Id.* at 373 (quoting *Rhodes*, 238 Va. at 486).

In order to show a willful, deliberate, premeditated killing, "[t]he intention to kill need not exist for any specified length of time prior to the actual killing." *Clozza v. Commonwealth*, 228 Va. 124, 134 (1984). "A design to kill may be formed only a moment before the fatal act is committed provided the accused had time to think and did intend to kill." *Id.* (quoting *Giarratano v. Commonwealth*, 220 Va. 1064, 1074 (1980)). In fact, under Virginia law, "an intent to kill may be formed at the moment of the commission of the unlawful act." *Jackson v. Virginia*, 443 U.S. 307, 324 (1979). "In deciding the question [of intent to kill], the jury properly may consider the brutality of the attack, whether more than one blow was struck, the disparity in size and strength between the accused and the victim, the concealment of the victim's body, and the defendant's efforts to avoid detection." *Clozza*, 228 Va. at 134.

- 6 -

The surveillance video from the apartment complex provided direct evidence linking Cappe to the shooting, assuming the jurors believed Cappe was one of the attackers in the video. The faces of the shooters can be seen in the video, but it is a grainy surveillance clip taken at night. Nonetheless, a rational jury certainly could conclude that Cappe was one of the men featured in the video.[4]

There is also significant circumstantial evidence that could support a rational inference that Cappe participated in the shooting. Cappe's vehicle matches the description of the vehicle seen on the surveillance video transporting the shooters. A cartridge casing found in Cappe's vehicle matched the cartridge casings found at the scene. Cappe's phone traveled toward the crime scene on the night in question; while it then turned off and could not be tracked, the phone it had been traveling with remained on and was present at the crime scene at the time of the murder. And once the photos of the shooters were published by local Channel 10 news, Cappe's phone sent a text saying, "Check 10" and received a response to "get rid of everything."

"Circumstantial evidence, if sufficiently convincing, is as competent and entitled to the same weight as direct testimony." *Lucas v. Commonwealth*, 75 Va. App. 334, 346 (2022) (quoting *McCain v. Commonwealth*, 261 Va. 483, 493 (2001)). "This Court does not view circumstantial evidence in isolation." *Id.* at 346-47. "Rather, the 'combined force of many concurrent and related circumstances, each insufficient in itself, may lead a reasonable mind irresistibly to a conclusion.'" *Id.* at 347 (quoting *Karnes v. Commonwealth*, 125 Va. 758, 764 (1919)).

Viewing the evidence as a whole, there was sufficient evidence for a rational trier of fact to conclude beyond a reasonable doubt that Cappe was one of the shooters. And given "the

---

[4] In fact, Cappe's defense attorney had Cappe stand in front of the jury and pose so that they could see his face from all angles. The jury similarly viewed Cappe over the course of a multiple-day trial.

brutality of the attack,[5] . . . the defendant's efforts to avoid detection,[6]" *Clozza*, 228 Va. at 134, and the video which shows the three men firing on the victim in unison, the totality of the evidence supports Cappe's convictions for both premeditated first-degree murder and use of a firearm.

### B. Conspiracy

"Conspiracy is defined as an agreement between two or more persons by some concerted action to commit an offense." *Velez-Suarez v. Commonwealth*, 64 Va. App. 269, 277 (2015) (quoting *Feigley v. Commonwealth*, 16 Va. App. 717, 722 (1993)). "There can be no conspiracy without an agreement, and the Commonwealth must prove beyond a reasonable doubt that an agreement existed." *Id.* (quoting *Feigley*, 16 Va. App. at 722). "Conspiracy 'requires knowledge of and voluntary participation in' the agreement to carry out the criminal act." *Carr v. Commonwealth*, 69 Va. App. 106, 117-18 (2018) (quoting *Zuniga v. Commonwealth*, 7 Va. App. 523, 527 (1988)). "Mere participation in the crime is insufficient to prove conspiracy; '[t]he agreement is the essence of the conspiracy offense.'" *Id.* at 118 (alteration in original) (quoting *Zuniga*, 7 Va. App. at 527-28).

> [D]efendants need not act in tandem while engaged in a conspiracy. When
>
> > "it has been shown that the defendants by their acts pursued the same object, one performing one part and the others performing another part so as to complete it or with a view to its attainment, the [fact finder] will be justified in concluding that

---

[5] The victim was shot at least 14 times, and the video shows the man alleged to be Cappe continuing to fire on the victim even after he lay motionless on the ground.

[6] According to Cappe's text messages, he appears to have gotten rid of any physical evidence after receiving a text advising him to do so.

- 8 -

they were engaged in a conspiracy to effect that object."

*Id.* (second alteration in original) (quoting *Brown v. Commonwealth*, 10 Va. App. 73, 78 (1990)).

"[A] conspiracy may be proved by circumstantial evidence." *Velez-Suarez*, 64 Va. App. at 277 (quoting *Floyd v. Commonwealth*, 219 Va. 575, 580 (1978)). "Indeed, from the very nature of the offense, it often may be established only by indirect and circumstantial evidence." *Id.* (quoting *Floyd*, 219 Va. at 580). This is because "'[m]ost conspiracies are "clandestine in nature,"' and '[i]t is a rare case where any "formal agreement among alleged conspirators" can be established.'" *Carr*, 69 Va. App. at 118 (second alteration in original) (quoting *Johnson v. Commonwealth*, 58 Va. App. 625, 636 (2011)).

Here there is no direct evidence of a conspiracy. However, the surveillance video shows the three men arriving at the property together, walking around the property together, coming upon the victim and simultaneously firing upon him, and running away together. A reasonable factfinder could conclude from this evidence that the men had planned the attack in advance, walked around the complex looking for the victim, and then acted together to murder him. Cappe's subsequent text stream regarding getting "rid of everything" further bolsters this conclusion. We therefore affirm the trial court's denial of Cappe's motion to strike each of his charges.

## II. Lay Witness Opinion Testimony

"Decisions regarding the admissibility of evidence 'lie within the trial court's sound discretion and will not be disturbed on appeal absent an abuse of discretion.'" *Blankenship v. Commonwealth*, 69 Va. App. 692, 697 (2019) (quoting *Michels v. Commonwealth*, 47 Va. App. 461, 465 (2006)). "Only when reasonable jurists could not differ can we say an abuse of discretion has occurred." *Turner v. Commonwealth*, 65 Va. App. 312, 327 (2015) (quoting *Grattan v. Commonwealth*, 278 Va. 602, 620 (2009)). However, "[a] trial court . . . 'by

- 9 -

definition abuses its discretion when it makes an error of law.'" *Robinson v. Commonwealth*, 68 Va. App. 602, 606 (2018) (quoting *Dean v. Commonwealth*, 61 Va. App. 209, 213 (2012)). Thus, "evidentiary issues presenting a 'question of law' are 'reviewed de novo by this Court.'" *Abney v. Commonwealth*, 51 Va. App. 337, 345 (2008) (quoting *Michels*, 47 Va. App. at 465).

A.  The Nature of Lay Opinion Testimony Involving Video Identification

"Opinion testimony by a lay witness is admissible if it is reasonably based upon the personal experience or observations of the witness and will aid the trier of fact in understanding the witness' perceptions."  Va. R. Evid. 2:701; *Martin v. Lahti*, 295 Va. 77, 85 (2018).  Our Supreme Court has explained that the language of Rule 2:701 possesses two prongs: "The first prong of Rule 2:701 requires personal knowledge."  *Harman v. Honeywell Int'l, Inc.*, 288 Va. 84, 98 (2014).  "The second prong of Rule 2:701 speaks to the necessity of the lay opinion testimony."  *Id.*  Moreover, Virginia precedent states that a "[l]ay opinion may relate to any matter, such as -- but not limited to -- . . . *identity*."  *Id.* (emphasis added).  Accordingly, "[a] lay witness may offer an opinion as to the identity of a person," *Bowman*, 30 Va. App. at 302 (quoting 2 Charles E. Friend, *The Law of Evidence in Virginia* § 17.10, at 21 (4th ed. 1993)), where the opinion is relevant and reasonably "based on the perception of the witness" or "the witness's personal knowledge," *Murray v. Commonwealth*, 71 Va. App. 449, 457 (2020) (quoting *Martin*, 295 Va. at 85), and "will aid the trier of fact in understanding the witness' perceptions," Va. R. Evid. 2:701.  *See Harman*, 288 Va. at 98.

Here, Cappe offered a witness, Kirkendall, to give lay opinion that the man in the video who shot Stephen White was *not* the defendant.

1.  Lay Opinion Relating to "Identity" and Video Identification

In examining the admissibility of lay opinion related to video identification, we start from the premise that such identifications differ markedly from eyewitness identifications:

Unlike eyewitness identifications, which are grounded on the witness' recollection of what the witness observed during the incident in question, an identification of a defendant by a nonpercipient witness in surveillance video or photographs is grounded on the witness' general familiarity with the defendant's appearance or the witness' familiarity with the defendant's appearance at the time that the incident occurred.

*State v. Gore*, 269 A.3d 1, 13-14 (Conn. 2022).

Accordingly, an eyewitness generally describes something that the jury cannot see for itself.[7]  By contrast, a witness who comments on surveillance video offers an opinion on images the jury will be able to view during the trial.  Thus, the pivotal question is whether the lay witness' perceptions can assist the jury in analyzing what they have seen:

[A] witness who identifies the defendant in surveillance video or photographs testifies regarding material that the jury also is able to observe.  Unlike the past events testified to by an eyewitness, the video or photographs in evidence are physically present in the courtroom.  So is the defendant.  The jury is therefore able to compare the defendant with the video or photographs.

*Id.* at 14.  Courts routinely have found that: "[T]estimony by those who knew defendants over a period of time and in a variety of circumstances offers to the jury a perspective it could not acquire in its limited exposure to defendants."  *United States v. Ellis*, 121 F.3d 908, 927 (4th Cir. 1997) (citation omitted); *United States v. Jackman*, 48 F.3d 1, 4-5 (1st Cir. 1995).  Similarly, "[a] lay witness may give an opinion concerning the identity of a person depicted in a surveillance photograph if there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph than the jury."  *Ellis*, 121 F.3d at 926-27 (quoting *United States v. Robinson*, 804 F.2d 280, 282 (4th Cir. 1986)).  In addition to long-standing knowledge of the subject's appearance, a lay witness' ability to identify the subject's "disguise" or distinctive clothing is also a factor courts have considered in admitting video-related

---

[7] Such a description may raise its own issues of credibility, perception, accuracy, and memory.  *See Daniels v. Commonwealth*, 275 Va. 460, 464-65 (2008).

identifications. *See Jackman*, 48 F.3d at 3, 5 (familiarity with defendant's coat and distinctive baseball cap worn in robbery videos); *Ellis*, 121 F.3d at 926-27 (familiarity with defendant in a disguise); *United States v. Towns*, 913 F.2d 434, 445 (7th Cir. 1990) (same).

Courts considering the usefulness of lay video identification testimony have generally refused to permit witnesses who have no prior familiarity with the subject from providing identity testimony based only on their readings of the video and photographs placed in evidence. In this situation, the lay witness and the jurors are on the same footing and it is not deemed helpful to permit the lay witness to interpret the images without any prior personal familiarity with the defendant's appearance. *See, e.g.*, *United States v. Jadlowe*, 628 F.3d 1, 24 (1st Cir. 2010) (finding lay opinion identification testimony improperly admitted where the witnesses were not "in a better position than the jurors to make the identity judgements"); *United States v. Fulton*, 837 F.3d 281, 299-300 (3d Cir. 2016) (prosecution witnesses not permitted to offer lay opinion where they had no familiarity with defendant at the time of the robbery); *United States v. Earls*, 704 F.3d 466, 472-73 (7th Cir. 2012) (prosecution witnesses had no familiarity with defendant prior to trial).[8]

Similarly, the quality of the images being reviewed is a factor in the "usefulness" analysis. Courts have observed that lay opinion is useful when the video or photographs "are not either so unmistakably clear or so hopelessly obscure that the witness is no better-suited than the jury to make the identification." *Jackman*, 48 F.3d at 5 (citing *Farnsworth*, 729 F.2d at 1160). For example, blurry images, a non-direct camera angle, and partially obscured facial features are factors which suggest that the jury would benefit from lay opinion assisting in the identification. *Id.*; *Gore*, 269 A.3d at 22.

---

[8] Similarly, here, the trial court excluded the lay opinion testimony of a prosecution witness who had no familiarity with Cappe prior to this shooting. That ruling was not appealed.

While federal cases are legion in analyzing lay video identifications under Federal Rule of Evidence 701, there is a dearth of Virginia case law on the issue. *See* B. Filbert, *Admissibility of Lay Witness Interpretation of Surveillance Photograph or Videotape*, 74 A.L.R.5th 643, 654-74, § 3[a] (1999) (compiling cases approving lay identification of subjects in surveillance video). In *Bowman*, this Court established that a lay witness is permitted to positively identify a person in a video for purposes of establishing their "identity." 30 Va. App. at 302. Indeed, in *Bowman*, we observed that testimony on "questions of identity" has been admissible in Virginia for over a century. *See Jordan v. Commonwealth*, 66 Va. (25 Gratt.) 943 (1874).[9] Here, Cappe sought to introduce testimony from Kirkendall for the proposition that he was *not* the shooter in the video. The Commonwealth argued that such negative evidence or "non-identification" evidence is unreliable and inadmissible. The trial court observed that no Virginia case law has previously permitted admission of this species of "non-identification" lay opinion. Accordingly, the trial court excluded the testimony.

2. The Trial Court Erroneously Found "Non-Identification" Testimony to be Inadmissible

The trial court found Kirkendall's proffered non-identification testimony to be unreliable. This ruling was based on the general type of testimony Kirkendall was attempting to present, rather than on any alleged lack of familiarity on the part of Kirkendall regarding Cappe's appearance. The court stated:

> I have issues regarding this witness testifying, again, in the converse to what was the holding in *Bowman*, where someone who had familiarity could identify a defendant. I think there are other

---

[9] In *Bowman*, this Court upheld a trial court's decision to permit Smith, Bowman's father-in-law and the grandfather of Bowman's children, to identify Bowman in videos and photos depicting burglaries at convenience stores. 30 Va. App. at 302. The father-in-law plainly was acquainted with Bowman, *id.*; however, on appeal Bowman challenged the father-in-law's familiarity with his appearance in the videos. This Court ruled that Bowman had waived this claim by never raising it below—accordingly, the decision does not discuss factors establishing familiarity. *Id.* at 301.

issues with the -- again, I'm not sure this is the right terminology to use, but the non-identification of a witness. Or by testifying that this is not the person, I think probably calls in different types of conclusions by the witness in looking at a witness and looking at a photograph or a video and being able to associate that by opinion with someone looking at a photograph and coming to the opinion that that is conclusively not somebody.

I do think there's a different analysis there that I don't have any case law to rely upon which allows that kind of testimony. I don't think it's reliable testimony, and I'm going to exclude this witness.

The trial court found that non-identification testimony involved "a different analysis" than a "positive" identification of a defendant in a video. We conclude that the trial court erred in ruling that such non-identification testimony is per se inadmissible.

Using the same logic that allows a lay witness to *identify* a person in a video or photo, we find that a lay witness' testimony that a person is *not* pictured in the video or photo is equally reliable, so long as the lay opinion testimony is based on that witness' personal knowledge, and will assist the trier of fact in understanding the witness' perceptions. *See Bowman*, 30 Va. App. at 302 (lay witness may offer evidence of identity); *Murray*, 71 Va. App. at 457 (setting out guidelines of Va. R. Evid. 2:701); *see also Jackman*, 48 F.3d at 3 (allowing defendant's brother to offer lay opinion defendant is not robber portrayed in surveillance video); *United States v. Knowles*, 889 F.3d 1251, 1258 (11th Cir. 2018) (permitting lay witness to assert defendant is not the subject in video). A rule that lay witnesses can identify defendants in a video, but cannot challenge or debunk such identifications would be one-sided and systemically unfair.

- 14 -

B.  Kirkendall Possessed Extensive Personal Knowledge of Cappe's Appearance
Such That Her Opinion Would Aid the Jury

Kirkendall proffered testimony that the man in the video was not Cappe.  She explained:

> [KIRKENDALL]: I'm looking at the facial -- the facial features.
> He has very, very strong lips.  He has a round head.  And when I
> seen him at the end of January, he did have braids in his hair, so
> . . . he had braids in his hair.  You could see them.  Just the way he
> had his hair braided, they would come to the side of his face.  So I
> don't see that in here.
>
> I can't see his facial features to see his full lips, to see the
> shape of his head.  He has a round head, and I don't see that in that
> photo.
>
> THE COURT: You cannot see that in the photo or --
>
> [KIRKENDALL]: I can't see that to be him.
>
> THE COURT: Based upon that rendering?
>
> [KIRKENDALL]: That is correct.
>
> . . . .
>
> [DEFENSE COUNSEL]: Was there anything about the physique
> or the physical aspects of the individual in that picture that you can
> compare to the defendant?
>
> [KIRKENDALL]: Well, the person in this picture is a lot smaller
> and has a very slim physique, and that is not what [Cappe] looks
> like.

The Commonwealth argues that Kirkendall did not have the requisite "personal knowledge" to opine as to whether Cappe was shown in the surveillance video because she had not seen him in the three months leading up to the shooting.  For example, she described his hairstyle in January (when she had seen him last) as braids that came to the side of his face, and she noted that the person shown in the video did not have that hairstyle.  When Cappe was arrested in May (a month after the shooting), he did not have braids—his hair instead appears to be cut short.

- 15 -

We find that, although Kirkendall had not seen Cappe in the three months prior to this incident, she did have the personal knowledge necessary to form an opinion as to whether Cappe was depicted in the surveillance footage. Kirkendall had known Cappe from his birth; she had spent considerable time with him over the years, and presumably would be able to recognize his image more easily than someone who had not seen him bi-weekly for years. She based her opinion on his size, physique, and the shape of his head—features with which she was familiar based on her personal knowledge.[10]

Here, Kirkendall's proffered testimony was based on her personal knowledge and familiarity with the subject and would aid the trier of fact in understanding the witness' perceptions.[11] Given her substantial and sustained contact with Cappe, her testimony should have been admitted. This, however, does not end our inquiry. We next must address whether the error was harmless in the face of abundant evidence that Cappe was one of the shooters who killed Stephen White.

## C. Harmless Error

"An appellate court reviews a decision to admit or exclude evidence where no federal constitutional issue was raised under the standard for non-constitutional harmless error provided in Code § 8.01-678." *Haas v. Commonwealth*, 299 Va. 465, 467 (2021).

---

[10] The fact that she had not seen him in the months leading up to the shooting would go to the weight of her testimony rather than its admissibility. "The proponent of the evidence bears the burden of establishing . . . the facts necessary to support its admissibility." *Church v. Commonwealth*, 71 Va. App. 107, 122 (2019) (alteration in original) (quoting *Perry v. Commonwealth*, 61 Va. App. 502, 509 (2013)). "Once this threshold for proving admissibility has been met, any gaps in the evidence are relevant to the trier of fact's assessment of its weight rather than its admissibility." *Id.* at 122-23.

[11] Additionally, the videos being reviewed were shot outdoors, around midnight. The quality of the images were in the range where jurors would be aided by knowledgeable lay opinion. *See Jackman*, 48 F.3d at 5 (lay testimony permissible where images are not either "so unmistakably clear or so hopelessly obscure that the witness is no better-suited than the jury to make the identification").

> Under that standard, the court "determine[s] whether there has been a fair trial on the merits and whether substantial justice has been reached [by] decid[ing] whether the alleged error substantially influenced the jury. If it did not, the error is harmless." In making the relevant determinations, the court "consider[s] the potential effect of the excluded evidence in light of all the evidence that was presented to the jury."

*Id.* (alterations in original) (quoting *Commonwealth v. Proffitt*, 292 Va. 626, 642 (2016)).

We find that here, the trial court's refusal to allow Kirkendall to testify was harmless error. First, we note that the evidence tying Cappe to the incident was substantial, including incriminating text messages, the recovery of Cappe's vehicle that matched the description of the getaway car, ammunition linked to the crimes in Cappe's vehicle, and cell phone data showing Cappe was near the scene of the crime at the time it occurred. Furthermore, the jury had multiple days of trial during which they could view Cappe; defense counsel asked Cappe to stand in front of the jury so that they could see his face at all angles and compare it to the video.[12] In fact, defense counsel freely argued in closing that Cappe had "stood right here in front of you" for three days, had distinctly different features than the shooter in the video, and that Cappe "is not that person . . . in that video." While Kirkendall's opinion could have aided the jury's analysis, the jurors were competent to conclude on this record whether Cappe was the shooter depicted in the video. *See Meade v. Commonwealth*, 74 Va. App. 796, 806 (2022) (appellate court reviews video to see whether a rational factfinder could have reached the conclusion adopted below).

Given these circumstances, we find that Kirkendall should have been permitted to testify based on her lengthy knowledge of the defendant's appearance, but the absence of her testimony

---

[12] Here, Kirkendall was a close family friend who regularly spent time with Cappe. Her knowledge of Cappe's appearance, however, was somewhat affected by the fact that she had not seen him for several months before the video was taken. During this time certain features relating to his appearance were subject to change; for example, when Cappe was arrested, he no longer wore the braided hair with which Kirkendall was familiar. His hair was cut short. While Kirkendall's lay opinion was relevant and admissible, we do not believe its exclusion could have influenced the verdict in light of the substantial evidence against the defendant.

did not substantially influence the outcome of the trial. Based on the extensive evidence linking Cappe to the killing, we conclude that the trial court's error in excluding Kirkendall's testimony was harmless. *See Commonwealth v. Kilpatrick*, 301 Va. 214, 216-17 (2022) (finding harmless error where "any error in excluding the testimony was insignificant" compared to the overwhelming evidence against the defendant).

CONCLUSION

We find that there was sufficient evidence to support each of Cappe's convictions. In addition to the video evidence, there was strong circumstantial evidence that Cappe was involved in the killing, including the text messages, cartridge casings evidence, and the car at the murder scene which was traced back to Cappe. Additionally, there was sufficient circumstantial evidence for a reasonable factfinder to conclude that the shooters conspired beforehand to commit the murder.

We also find that the trial court erred in ruling that a lay witness cannot offer opinion testimony that a defendant is not the person shown in a video. Under *Bowman* and Rule 2:701, we find that such testimony is admissible lay opinion relating to "identity" as long as the testimony is based on the witness' personal knowledge of the subject and will aid the jury in understanding the witness' perceptions. Here, Kirkendall's testimony met that test—she stated that she had known Cappe since birth, she saw him regularly, and she gave a detailed description of his physical appearance and the attributes that caused him to stand out to her. Nonetheless, we find that the erroneous exclusion of Kirkendall's testimony did not substantially influence the jury. In light of the extensive evidence tying Cappe to the murder, we conclude that the jury's verdict would not have been affected by the admission of Kirkendall's non-identification testimony. The judgment is affirmed.

*Affirmed.*

Chaney, J., concurring in part, dissenting in part, and dissenting from the judgment.

I concur in the majority's holding that the trial court erred in excluding a defense witness's exculpatory lay opinion testimony that Sh'Kise Cappe was not one of the perpetrators depicted in the security video of the murder. I respectfully dissent from the holding that this error was harmless and from the judgment affirming Cappe's convictions.

The security video of the murder depicts three individuals as they walked around in a housing complex for several minutes until they encountered the victim in a parking lot. All three individuals wore hooded jackets with the hoods up, covering their heads. One of the three also wore a face-covering mask. After approaching the victim and standing with him for a few seconds, the three individuals fired multiple shots at him. They continued shooting as the victim turned and attempted to run away. After the victim fell to the ground, two of the shooters fled as one of the shooters approached the victim and shot him again multiple times. The shooter who fired the final shots at the victim—alleged to be Cappe—was not wearing a mask.

The trial court erroneously excluded crucial defense evidence related to the security video which—if accepted as true by the jurors—would have required Cappe's acquittal. After viewing the security video, defense witness Lakesha Kirkendall would have told the jury that she was very familiar with Cappe's distinctive physical characteristics and could see that the person in the video was not Cappe. As a friend of Cappe's mother who had known Cappe all his life, Kirkendall had regular in-person contact with Cappe "every other week or . . . every two weeks" until mid-January 2020, three months before the events recorded in the video.

When Kirkendall testified outside the presence of the jury, she was shown still photos created from the security video depicting the shooter alleged to be Cappe. One of the still photos was a close-up of the shooter's face. When asked whether Cappe was the individual depicted in the security video and photos, Kirkendall definitively testified, "No, it's not."

Kirkendall's opinion that the individual in the security video is not Cappe was based on her knowledge of Cappe's enduring physical features and characteristics, including his facial features and physical build. Kirkendall testified that the facial features of the individual in the security video were not the same as Cappe's. In particular, Kirkendall opined that, unlike the person in the video, Cappe had "full lips"—"very, very strong lips." Kirkendall further testified that the individual in the security video "is a lot smaller" than Cappe and, unlike Cappe, "has a very slim physique." Observing images of the individual in the security video, Kirkendall opined, "that is not what [Cappe] looks like."[13]

If the jurors had been allowed to hear Kirkendall's testimony and had accepted as true her definitive opinion that the individual in the security video is not Cappe, the jurors would have been compelled to find Cappe not guilty. By discounting Kirkendall's exculpatory testimony, the majority invades the province of the jury. *See Kiddell v. Labowitz*, 284 Va. 611, 626 (2012) ("The credibility of witnesses and the weight to be given their testimony are matters peculiarly within the province of the jury." (quoting *Williams v. Vaughan*, 214 Va. 307, 310 (1973))).

"[I]n determining whether an error is harmless, 'we must review the record and the evidence and evaluate the effect the error may have had on how the finder of fact resolved the contested issues.'" *Becker v. Commonwealth*, 64 Va. App. 481, 497 (2015) (quoting *Lavinder v. Commonwealth*, 12 Va. App. 1003, 1007 (1991) (en banc)). "This Court may uphold a decision on the ground that any error involved is harmless only if it can conclude, without usurping the jury's fact-finding function, 'that the error did not influence the jury[] or had but slight effect.'" *Graves v. Commonwealth*, 65 Va. App. 702, 712 (2016) (alteration in original) (quoting *Clay v.*

---

[13] Kirkendall also testified that Cappe "had braids in his hair" that "would come to the side of his face," but she did not see braided hair when observing the individual in the security video—who had a hood tied close around his face. Kirkendall did not testify about whether Cappe's hair was cut short when she last saw him.

*Commonwealth*, 262 Va. 253, 260 (2001)). "If the Court 'cannot say, with fair assurance, . . . that the judgment was not substantially swayed by the error, it is impossible to conclude that [the appellant's] substantial rights were not affected' and the conviction must be reversed." *Id.* (alterations in original) (quoting *Clay*, 262 Va. at 260).

The erroneous exclusion of Kirkendall's exculpatory testimony was not rendered harmless by the fact that the jurors had the opportunity to observe Cappe in court and compare him with the images in the security video. As the majority notes, "[t]he quality of the images [in the video] were in the range where jurors would be aided by knowledgeable lay opinion." This Court cannot conclude with fair assurance that Kirkendall's exculpatory testimony would not undermine jurors' confidence in a finding that Cappe was one of the shooters depicted in the security video. Thus, this Court cannot reasonably conclude that the erroneous exclusion of the exculpatory testimony did not substantially affect the jury's verdict. The error is not harmless because the evidence apart from the security video does not amount to such overwhelming evidence of guilt that the erroneous exclusion of Kirkendall's exculpatory testimony is insignificant by comparison. *See Angel v. Commonwealth*, 281 Va. 248, 268 (2011).

Therefore, because it is impossible to conclude with fair assurance that the erroneous exclusion of Kirkendall's exculpatory testimony did not affect Cappe's substantial rights and deprive him of a fair trial on the merits, I would reverse the trial court's judgment, vacate Cappe's convictions, and remand for retrial. Accordingly, I respectfully dissent from the judgment affirming Cappe's convictions.

- 21 -