IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JOSEPH COVERDALE, | § | |
| | § | |
| Defendant-Below | § | No. 319, 2022 |
| Appellant, | § | |
| | § | Court Below—Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | Cr. ID No. 1911015487 A/B(N) |
| STATE OF DELAWARE, | § | |
| | § | |
| Appellee. | § | |

Submitted: July 12, 2023
Decided: September 14, 2023

Before **SEITZ**, Chief Justice; **VALIHURA** and **TRAYNOR**, Justices.

## **ORDER**

This 14th day of September, 2023, after careful consideration of the parties' briefs, the argument of counsel, and the record on appeal, it appears to the Court that:

(1) On the morning of November 22, 2019, having received a shots-fired complaint, officers from the Wilmington Police Department ("WPD") responded to the 200 block of North Franklin Street. The officers arrived on the scene within minutes, but the shooters had fled. In the course of his investigation, Detective Joran Merced—the lead detective in the case—obtained video-footage from the local

"CitiWatch"[1] surveillance camera, located at the corner of 2nd and Franklin Streets. The video showed that, before the shots-fired incident, two men approached and robbed an individual in a red jacket, later identified as Markell Rollins, on Franklin Street. A man wearing a black puffy jacket with a hoodie, later identified as Joseph Coverdale, pulled out what appeared to be a firearm with an extended magazine and showed it to the man in the red jacket before reaching into the man's pockets. The other man, wearing a blue jean jacket, later identified as Jamil T. Biddle,[2] reached into the pockets of the man in the red jacket and retrieved what appeared to be an unknown quantity of money, before he walked away with the man in the black hoodie, around the corner and out of camera view. The video also captured an exchange of gunfire further down the street shortly after this apparent robbery. The man in the blue jean jacket can be seen in this video as well. Whether Coverdale can be seen in this video is less clear.

(2)     Detective Merced reviewed the video of the robbery on the day of the incident but was unable to identify any of the individuals in the video. In consequence, he created an "attempt-to-identify" flyer using several screenshots from the video, which he disseminated to WPD officers in an effort to make

---

[1] CitiWatch cameras are located throughout Wilmington and are livestreamed to the WPD.
[2] By order dated July 31, 2023, this Court affirmed the conviction of Coverdale's co-defendant, Jamil T. Biddle. *See Biddle v. State*, 2023 WL 4876018 (Del. July 31, 2023).

identifications. Several officers in the WPD's Crime Streets Unit also watched the video.

(3) Ultimately, officers identified the victim, Rollins, as well as Coverdale and Biddle. And on November 25, Detective Merced spoke with Rollins, who advised that he was approached by a person with a gun and robbed of $150 cash. That same day, Detective Merced applied for and was granted an arrest warrant for Coverdale and Biddle. The police arrested Coverdale on December 31.

(4) A New Castle County grand jury indicted Coverdale and Biddle for robbery in the first degree, two counts of possession of a firearm during the commission of a felony, two counts of conspiracy in the second degree, and two counts of attempted assault in the first degree. Coverdale was also indicted for carrying a concealed deadly weapon, possession of a firearm by a person prohibited, and possession of ammunition by a person prohibited.

(5) Neither Coverdale nor Biddle moved for relief from their joinder for trial, so they were scheduled for trial together.

(6) Before trial, Biddle filed a motion *in limine* seeking to preclude, among other things, testimony from police witnesses identifying him as one of the individuals depicted in the surveillance video. Coverdale joined in the motion, challenging the officers' identification of him in the video. Relevant to the issues raised in this appeal, Biddle and Coverdale contended that the officers' testimony

3

was inadmissible lay opinion testimony that "usurp[ed] the fact-finding function of the jury."[3]

(7)     The Superior Court held a pretrial hearing to allow *voir dire* examination of the officers so that the court could determine whether to allow the officers to give lay opinion testimony identifying Coverdale and Biddle as the suspects in the video.  At the hearing, four police officers testified: Detective Gaetan MacNamara, Corporal David Schulz, Corporal Leonard Moses, Sergeant Kecia Rosado—each of whom is or was a member of WPD's Street Crimes Unit.

(8)     Each officer testified about their prior personal interactions with Coverdale and their familiarity with his physical attributes, including his approximate height and weight as well as his facial features.  Detective MacNamara related that he had personally interacted with Coverdale 35 to 45 times, Corporal Schulz testified that he had interacted with him 10 to 15 times, while Corporal Moses said that he had done so on approximately 30 to 50 occasions.  Sergeant Rosado had far fewer interactions with Coverdale—five to six times—then the other officers, but she had observed him in public approximately 50 to 100 times.  All of the testifying officers were familiar with Coverdale's ornate neck tattoo.

(9)     After hearing this testimony and viewing the video, the Superior Court denied the defendants' motion *in limine*.  The court was convinced that a proper

---

[3] App. to Answering Br. at B25.

foundation was laid and that the officers had special familiarity with Coverdale and Biddle based on the officers' numerous interactions with the codefendants. And specifically as to Coverdale, the court observed that

> [t]he issue . . . is . . . whether the video and/or photograph is so crystal clear that the officers would not need to testify and the jury could simply take a look at what was on the video and make a determination, in that case the video did have Mr. Coverdale with a hood on. In looking at the video, it was not crystal clear that the person sitting in court today is that individual. And just based on the foundation that I believe the officers have established with respect to Mr. Coverdale and their familiarity with him, the court finds that their testimony in this regard again would fall within the permitted parameters of *Saavedra* [*v. State*] and even *Thomas* [*v. State*].[4]

(10) At trial, the State first called Detective Merced to authenticate the video and the "attempt-to-identify" flyer that had been disseminated to the WPD officers.[5] Thereafter, the State called Corporal Schulz, Corporal Moses, and Detective MacNamara as witnesses to offer lay opinion testimony identifying Coverdale and Biddle in the video.

(11) Each of the officers also testified at trial about their special familiarity with Coverdale and Biddle; this foundational testimony largely tracks the testimony given at the pre-trial hearing as described above.

---

[4] App. to Opening Br. at A323 (citing *Saavedra v. State*, 225 A.2d 364 (Del. 2020) and *Thomas v. State*, 207 A.3d 1124, 2019 WL 1380051 (Del. March 26, 2019) (TABLE).
[5] App. to Opening Br. at A430–32, A447–9.

5

(12)    Corporal Schulz identified Coverdale and Biddle in court and, after the video was played, identified each of them in the video.  He testified that Coverdale was wearing a black puffy coat with a black hood up over his head and black pants with a red stripe.  Corporal Schulz noted that Coverdale had a neck tattoo in a photograph taken one month after the robbery but that the tattoo was not exposed in the video.  He stated that Coverdale had "very light-in-color eyes."[6]  He also testified that Coverdale appeared to be holding a firearm with a large extended magazine.

(13)    Next, the State next called Corporal Moses, who identified Coverdale and Biddle in court.  After the video was played, Corporal Moses identified Coverdale as the person wearing "all black, black hoodie up on his head," "with the firearm with the extended magazine."[7]  Corporal Moses testified that, despite Coverdale's hoodie, he could see what appeared to be "red on his neck," which he believed was part of Coverdale's neck tattoo.[8]  He stated that Coverdale's facial features looked similar to the subject in the video.  Corporal Moses then identified Biddle as the person wearing a "jean jacket" in the video.  He testified that, despite Biddle's changed appearance,[9] Biddle was the same person he identified in the video.

---

[6] *Id.* at A486.
[7] *Id.* at A506–08.
[8] *Id.* at A509.
[9] At trial, Biddle appeared with a new hairstyle (lengthy braids) and wearing glasses. *See id.* at A710–11.  According to the officers, before his arrest, Biddle had shorter hair and did not wear glasses. *See id.* at A728–29.

6

(14)  Before the State called its next witness, Coverdale's counsel renewed a prior objection, arguing that additional officers should not be allowed to testify on the issue of identity because such testimony would be cumulative.  But the court noted that Corporal Moses's testimony differed from Corporal Schulz's testimony, because only Corporal Moses testified that he could see Coverdale's tattoo in the video.  As a result, the court determined that the State could call one more officer on the issue of identity.

(15)  The State then called Detective MacNamara, who identified Coverdale and Biddle in the courtroom.  After watching the video, Detective MacNamara identified Coverdale as the person wearing a "black-in-color puffer coat with the black-in-color hooded sweatshirt up around his head" and Biddle as the person wearing the "denim jacket."[10]  He testified that he was not able to see Coverdale's neck tattoo in the video but noted that Coverdale has a "lighter skin tone" and his eyes are "rather distinct" because they "kind of jump out of his head a little bit."[11] He indicated that Coverdale's facial features were similar to those of the person in the video wearing the black hoodie.  He also testified that, despite Biddle's changed appearance at trial, Biddle was the same individual that he identified in the video.

---

[10] *Id.* at A529–31.
[11] *Id.* at A530–32.

(16) The State then called Corporal Flemming, a member of the forensic services team, who responded to the scene on November 22, 2019, and took photographs of the evidence, including the casings and cartridge collected from the scene. Afterwards, the State called Detective Stephey, who works in the ballistics section of the WPD. He testified that the casings collected were nine millimeters. The State then recalled Detective Merced who testified that he did not observe Coverdale possessing a firearm in the beginning of the video, which was indicative of concealment, and that Coverdale does not have a permit to carry a concealed deadly weapon.

(17) After the State rested its case-in-chief, Coverdale's counsel moved for judgment of acquittal, arguing that the State failed to prove the element of theft essential to the charge of robbery in the first degree, because there was no evidence that any property was taken from the victim. In addition, he argued that the State failed to prove the assault charges, because the State's theory was that Coverdale fired back at the unknown men in the video from a position that could not be seen in the video.

(18) The Superior Court drew all inferences in the light most favorable to the State and determined that a rational trier of fact could find that Coverdale and Biddle were guilty beyond a reasonable doubt of the charged offenses. The court therefore denied Coverdale's motion. The court noted, however, that, "barring

8

identity, it's going to be a tough call on the . . . attempted assault charges[,]" which are "purely circumstantial."[12] Coverdale did not put on a defense. Biddle called his fiancé, Adejah Carter, as an alibi witness but did not testify himself.

(19) During the State's closing argument, the prosecutor argued that the video showed that Coverdale held Rollins at gunpoint while Biddle put his hand into the front jacket pocket of Rollins and took out what appeared to be money. The prosecutor argued that Biddle transferred the money into his left hand and then continued going through Rollins's pockets, before Coverdale and Biddle walked away counting the money. The prosecutor also argued that Coverdale was in physical possession of the firearm and that Coverdale concealed the firearm until he approached Rollins with it to commit the robbery.

(20) The court then instructed the jury regarding, among other things, the identification of the defendants. It stated:

> [t]o find the defendants guilty, you must be satisfied beyond a reasonable doubt that the defendants have been accurately identified[,] that the wrongful conduct charge in this case actually took place[,] and that the defendants were in fact the persons who committed the act. If there is any reasonable doubt about the identification of the defendants, you must give the defendants the benefit of such doubt and find the defendants not guilty.[13]

---

[12] *Id.* at A695.
[13] *Id.* at A871.

(21) The next day, the jury returned its verdict, finding Coverdale guilty of robbery in the first degree, possession of a firearm during the commission of a felony, carrying a concealed deadly weapon, and conspiracy in the second degree. The jury acquitted Coverdale, however, as to both counts of attempted assault in the first degree as well as the related weapon and conspiracy charges. Immediately after the jury verdict, the trial judge found Coverdale guilty of the person-prohibited charges, which had been severed from the other charges. After a presentence investigation, the court sentenced Coverdale to 11 years of Level V incarceration, followed by decreasing levels of supervision, and Coverdale appealed to this Court.

(22) Coverdale makes three arguments on appeal. First, like Biddle, he argues that the Superior Court erred when it denied his motion *in limine* to exclude police officer testimony identifying him as one of the individuals depicted in the incriminating surveillance video. Second, Coverdale contends that, because there was no evidence that a theft occurred and theft is an essential element of robbery, the trial court erred by denying his motion for judgment of acquittal on the robbery charge. Third, the Superior Court erred by allowing the prosecutor to make unfounded prejudicial remarks during closing argument even though Coverdale did not object to the remarks when they were made. We see no merit in Coverdale's arguments and, for the following reasons, affirm his convictions.

10

(23) This Court reviews the Superior Court's evidentiary rulings for abuse of discretion.[14] We review the Superior Court's denial of a motion for judgment of acquittal *de novo* to determine whether a rational trier of fact, viewing the evidence in the light most favorable to the State, could have found the essential elements, beyond a reasonable doubt.[15] Where defense counsel fails to object to alleged prosecutorial misconduct at trial and the trial judge does not intervene *sua sponte*, this Court reviews the claim only for plain error.[16]

(24) Coverdale contends that the officers' identification of the persons depicted on the surveillance video ran afoul of D.R.E. 701's limitations on lay opinion testimony. D.R.E. 701, which governs opinion testimony by lay persons, provides that

> [i]f a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical or other specialized knowledge within the scope of Rule 702.

(25) Coverdale's argument relies heavily upon our decision in *Thomas v. State*.[17] In *Thomas*, we questioned "how the testimony of a police officer—or any other witness without a particular expertise in comparing a videographic representation of a person with a suspect or defendant—would be helpful to the

[14] *Thomas*, 2019 WL 1380051, at *2.
[15] *Wright v. State*, 980 A.2d 372, 376–77 (Del. 2009).
[16] *Baker v. State*, 906 A.2d 139, 150 (Del. 2006).
[17] *Thomas*, 2019 WL 1380051.

factfinder in resolving an identification issue."[18]  But our more recent guidance in *Saavedra* permits such lay opinion testimony in certain situations.

(26)  In *Saavedra*, we explained that "[b]efore a law enforcement witness uses a video clip or photograph to identify the defendant, due caution should be exercised to ensure that a proper foundation is laid establishing, to the trial court's satisfaction, that the witness has a special familiarity with the defendant that would put him in a better position than the jury to make the identification."[19]  We further noted that, "in determining whether the witness occupies such a position, the court should also consider whether the images from which the identification is to be made 'are not either so unmistakably clear or so hopelessly obscure that the witness is no better suited than the jury to make the identification.'"[20]

(27)  As described above, in this case, the Superior Court considered the *voir dire* examination of the officers and was satisfied that the State established a proper foundation for the admission of the officers' lay opinion testimony at trial in accordance with *Saavedra*.  In reaching this conclusion, the court determined, first, that the officers had a special familiarity with Coverdale and Biddle based on numerous prior interactions with each of them, and, second, that the video was "within the buffer zone of hopelessly secure or abundantly clear such that the

---

[18] *Id.* at *3.

[19] *Saavedra*, 225 A.3d at 380–81.

[20] *Id.* at 381 (quoting *U.S. v. Jackman*, 48 F.3d 1, 4–5 (1st Cir. 1995)).

12

[officers'] testimony . . . would not run afoul of . . . [this] Court's instructions [in *Saavedra*]."[21]

(28)   As we ruled in *Biddle v. State*, "the trial court faithfully applied the factors that we set forth in *Saavedra* and did not err in admitting the [identification] evidence."[22]  We noted further in *Biddle* that the trial court included an appropriate identification instruction to the jury.[23]  Thus, we find no abuse of discretion in the Superior Court's denial of the motion *in limine*.

(29)   Coverdale next argues that the court's denial of his motion for judgment of acquittal was error, because the video evidence alone was not sufficient to establish that Coverdale committed a robbery.  In particular, Coverdale claims that without testimony that property or money was taken from Rollins, the evidence of theft—an element of robbery—was insufficient.  He further argues that, had the court properly granted his motion, he would have also been acquitted of the related firearm and conspiracy charges as well.

(30)   Under 11 *Del. C.* § 832,

[a] person is guilty of robbery in the first degree when the person commits the crime of robbery in the second degree and when, in the course of the commission of the crime or of immediate flight therefrom, the person or another participant in the crime:
. . .

---

[21] App. to Opening Br. at A322.
[22] 2023 WL 4876018, at *8 (Del. July 31, 2023).
[23] *Id.*

13

(2) [d]isplays what appears to be a deadly weapon or represents by word or conduct that the person is in possession or control of a deadly weapon[.]

A person commits robbery in the second degree

"when, in the course of committing theft, the person uses or threatens the immediate use of force upon another person with intent to (1) [p]revent or overcome resistance to the taking of the property or to the retention thereof immediately after the taking; or (2) [c]ompel the owner of the property or another person to deliver up the property or to engage in other conduct which aids in the commission of the theft."[24]

A person commits theft "when the person takes, exercises control over or obtains property of another person intending to deprive that person of it or appropriate it."[25] To convict Coverdale of possession of a firearm during the commission of a felony, the State was required to prove that Coverdale knowingly and unlawfully possessed a firearm during the robbery.[26] Conspiracy in the second degree requires the State to prove that Coverdale agreed with another person, that one, the other, or each of them would commit a robbery, and that one, the other, or each of them committed an overt act in pursuance of the conspiracy.[27]

(31) The State argues that the video evidence, along with the police officers' identification testimony, provides sufficient evidence of theft to sustain Coverdale's robbery conviction. More specifically, the State contends that the video shows that

---

[24] 11 *Del. C.* § 831(a).
[25] 11 *Del. C.* § 841(a).
[26] 11 *Del. C.* § 1447A.
[27] 11 *Del. C.* § 512.

14

two men, one wearing a black hoodie and wielding a firearm—Coverdale—and the other wearing a jean jacket approached the victim, held him at gunpoint, and rummaged through his pockets. The video shows, according to the State, that the man in the jean jacket—Biddle—removed what appeared to be money from the victim's jacket, before he and the man in the black hoodie walked away. It also contends that the video depicts Biddle counting the money after the robbery.

(32) We have viewed the video and find the State's characterization of it to be fair and accurate. No doubt, one might quibble with whether the property Biddle lifted out of Rollins's pocket while Coverdale held him at gunpoint was U.S. currency or some other form of property. But there is little, if any, doubt from the video evidence that Biddle took something out of Rollins's pocket, and that is sufficient to satisfy the theft element of robbery. In sum, viewing the evidence in the light most favorable to the State, the jury was presented sufficient evidence to conclude beyond a reasonable doubt that Coverdale, either as principal or an accomplice, committed the theft element necessary to convict him of robbery in the first degree. This conclusion, in turn, is sufficient to support Coverdale's related possession of a firearm during the commission of a felony and conspiracy convictions.

15

(33) Finally, Coverdale contends that he was materially prejudiced by the State's misconduct in closing argument, namely, the prosecutor's argument that Coverdale had a gun and that money was taken from Rollins.

(34) When confronted with a claim of prosecutorial misconduct, "we first engage in a *de novo* review to determine whether the prosecutor's actions rise to the level of misconduct. If we determine that no misconduct occurred, the analysis ends there. . . ."[28] If we find misconduct, we then determine whether the issue was fairly presented below and, if it was not, we review "only for plain error."[29] We recently summarized the plain error standard:

> For an error to be "plain" under this standard, it must be so clearly prejudicial to substantial rights as to jeopardize the very fairness and integrity of the trial. Findings of plain error are limited to material defects that are apparent on the face of the record, basic, serious and fundamental in their character. [30]

Coverdale concedes that he did not object to the statements that form the basis of his prosecutorial-misconduct claim.

(35) Here, the prosecutor could not fairly be charged with misconduct. Although the firearm Coverdale was charged with possessing was not introduced into evidence—because it was not recovered—the jury could reasonably infer from the surveillance video that the item in Coverdale's hands, which appeared to be a

---

[28] *Watson v. State*, __ A.3d ___, 2023 WL 5030026, at *5 (Del. Aug. 8, 2023).
[29] *Baker*, 906 A.2d 139, 148.
[30] *Watson*, 2023 WL 5030026, at *5 (quotations, footnotes, brackets, and ellipsis omitted).

16

firearm and which Coverdale certainly intended Rollins to believe was real, was actually a firearm. And an inference was not required to determine that Biddle took something out of Rollins's pocket as Coverdale brandished the weapon; the jury was able to watch it happen on the video. Stated simply, asking the jury to believe what they could plainly see was not improper. Even less was it plainly erroneous for the court to refrain from interceding *sua sponte* on Coverdale's behalf.

NOW, THEREFORE, IT IS ORDERED that the judgment of the Superior Court is AFFIRMED.

BY THE COURT:

*/s/ Gary F. Traynor*
Justice