IN THE SUPREME COURT OF THE STATE OF DELAWARE

MILIK MCKNIGHT, §
§
    Defendant Below, § No. 127, 2024
    Appellant, §
§ Court Below—Superior Court
    v. § of the State of Delaware
§
STATE OF DELAWARE, § Cr. ID No. N2206012342 A, B
§
    Appellee. §

Submitted: November 21, 2024
Decided: January 22, 2025

Before **TRAYNOR**, **LEGROW**, and **GRIFFITHS**, Justices.

## **ORDER**

After consideration of the brief and motion to withdraw filed by the appellant's counsel under Supreme Court Rule 26(c), the State's response, and the Superior Court record, it appears to the Court that:

(1)    A Superior Court jury found Milik McKnight guilty of attempted first-degree murder, possession of a firearm during commission of a felony, first-degree conspiracy, and carrying a concealed deadly weapon. The judge then found McKnight guilty of possession of a firearm by a person prohibited. The court sentenced McKnight to a total of sixty-one years of imprisonment, suspended after twenty-three years. This is McKnight's direct appeal.

(2) McKnight's counsel has filed a brief and a motion to withdraw under Supreme Court Rule 26(c). Counsel asserts that he has made a conscientious review of the record and the law and concluded that the appeal is without merit. Counsel informed McKnight of the provisions of Rule 26(c) and provided him with a copy of the motion to withdraw and the accompanying brief. Counsel also informed McKnight of his right to supplement counsel's presentation. McKnight responded with points for the Court's consideration, which counsel included with the Rule 26(c) brief. The State has responded to the Rule 26(c) brief and argues that the Superior Court's judgment should be affirmed.

(3) The charges against McKnight arose from a shooting that occurred late in the evening of June 21, 2022, in Wilmington's Riverside area. Shortly before midnight, the Wilmington Police Department received a ShotSpotter alert indicating that six shots had been fired near 2701 Northeast Boulevard. They also received a 911 call reporting the incident. The first officer who arrived on the scene found Jarrod Reams lying on the sidewalk outside Crown Pizza, a convenience store located at the corner of Northeast Boulevard and 27th Street. Reams had gunshot wounds to his torso. Emergency medical personnel transported him to Christiana Hospital, where he received lifesaving treatment. Reams declined forensic nursing services and was intubated when the chief investigating officer, Detective Kevin Nolan, attempted to interview him at the hospital. Reams did not testify at trial.

2

(4)    Video-only surveillance cameras from several angles inside the store and on the outside the building recorded some of what transpired on the night of the incident.  At approximately 11:53, four men crossed Northeast Boulevard and walked down 27th Street, along the side of the Crown Pizza building.  The first man ("Suspect 1"), whom the State alleged to be McKnight, was wearing a dark sweatshirt with a green logo, dark pants with ripped knees, and dark sneakers with white laces and soles.  The second man ("Suspect 2") was wearing a dark sweatshirt with a yellow Nike logo, dark pants, and blue sneakers.  The third man ("Suspect 3") was wearing light gray pants, a dark sweatshirt with a large white logo, and black sneakers with white soles.  The fourth man ("Suspect 4") was wearing dark pants, a dark sweatshirt with the word "Carry" on the front in large, white letters, and white sneakers.

(5)    Reams was standing inside the store and would have been clearly visible from outside as the suspects walked by the open door.  There were also several bystanders in the store.  The suspects disappeared behind the building for less than a minute, then walked back up 27th Street and entered the store.  The faces of Suspects 1, 3, and 4 were covered with masks and their sweatshirt hoods were up, and Suspects 3 and 4 appeared to have turned their sweatshirts inside out.[1]  Suspect

---

[1] The word "Carry" on Suspect 4's sweatshirt was still clearly visible, although backwards, and the tags of the two suspects' sweatshirts were now visible outside the sweatshirts.

2's face was visible. Upon seeing the suspects enter, Reams promptly left the store, followed by Suspect 1 and then the others. Outside, Suspect 1 pushed Reams against the wall and appeared to pull something from the area of his own sweatshirt pocket or waistband, as the two moved out of the camera view. As that happened, Suspect 3 appeared to pull out a gun and point it at Reams, moving toward Suspect 1 and Reams and also briefly out of the camera view. Suspect 1 then ran away across Northeast Boulevard, holding a dark object in his hand. Suspect 3 also fled across Northeast Boulevard. Suspects 2 and 4 ran around the corner, down 27th Street.

(6)     Detective Nolan also reviewed videos from the Crown Pizza cameras from the night before the shooting and determined that some of the suspects had visited the store the night before; the suspects' faces were visible on the earlier videos. After disseminating videos and still shots from the videos to other officers, Detective Nolan identified McKnight, Arkye Matthews, and others as suspects. McKnight was arrested on July 19, 2022. During a brief post-*Miranda* interview with Detective Nolan, McKnight seemed to acknowledge that a still shot from the Crown Pizza footage from the night before the shooting was him, though he quickly recanted that statement.

(7)     Matthews was arrested on July 22, 2022. During the execution of his arrest warrant, an officer found a SIG Sauer 9mm handgun. A firearms identification examiner determined that four of the five shell casings that had been found outside

4

Crown Pizza on the night of the shooting had been fired from that gun and that the fifth casing had been fired from a different gun. A gun matching the fifth casing was not recovered.

(8)    The State's case at trial turned on whether Suspect 1, the man wearing the sweatshirt with the green logo, was McKnight, and whether that person had shot at Reams. Among other evidence offered to prove that Suspect 1 was McKnight, the State presented evidence that McKnight was wearing the same clothing—including the sweatshirt with the green logo, the dark pants with ripped knees, and the dark sneakers with white laces and soles—when, on the night before the shooting, (i) he was a passenger in a vehicle and showed the officers his identification during a traffic stop, and (ii) he visited Crown Pizza without his face covered, as depicted on the videos from the night before the shooting.

(9)    When reviewing a motion to withdraw and an accompanying brief under Rule 26(c), this Court must be satisfied that the appellant's counsel has made a conscientious examination of the record and the law for arguable claims.[2] This Court must also conduct its own review of the record and determine whether "the appeal is indeed so frivolous that it may be decided without an adversary presentation."[3]

---

[2] *Penson v. Ohio*, 488 U.S. 75, 83 (1988); *McCoy v. Court of Appeals of Wisconsin*, 486 U.S. 429, 442 (1988); *Anders v. California*, 386 U.S. 738, 744 (1967).
[3] *Penson*, 488 U.S. at 82.

(10)   McKnight's first argument is that the Crown Pizza surveillance videos were not properly authenticated.  He contends that the prosecution therefore engaged in prosecutorial misconduct, and violated due process, by offering the videos into evidence.  He bases his authenticity challenge on a one-hour difference between the videos' timestamp and the actual time and the fact that Detective Nolan downloaded the videos a day or two after the shooting, rather than that night.  McKnight speculates that someone might have tampered with the videos between the time of the incident and when Detective Nolan downloaded the videos.

(11)   McKnight did not object to the admissibility of the videos or assert a claim of prosecutorial misconduct at trial.  We therefore review for plain error.[4]  As stated in *Wainwright*, "[u]nder the plain error standard of review, the error complained of must be so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process."[5]  In reviewing a claim of prosecutorial misconduct for plain error, we first examine the record *de novo* to determine whether prosecutorial misconduct occurred.[6]  If we determine that no misconduct occurred,

---

[4] *Trala v. State*, 244 A.3d 989, 998 (Del. 2020); *Smith v. State*, 839 A.2d 666, 2003 WL 22931398, at *1 (Del. Dec. 9, 2003) (TABLE).
[5] *Wainwright v. State*, 504 A.2d 1096, 1100 (Del. 1986).
[6] *Trala*, 244 A.3d at 998.

6

our analysis ends.[7]  If we find misconduct, then we apply the *Wainwright* standard to determine whether reversal is warranted.[8]

(12)   We find no plain error as to the videos' authentication.  Rule 901 of the Delaware Uniform Rules of Evidence provides:  "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."[9]  The authentication requirement is "fundamental," but "it imposes only a lenient burden that is easily met."[10]  In order to authenticate an item of evidence, "the State need only establish a rational basis from which the jury could conclude that the evidence is connected with the defendant."[11]  "There are no hard-and-fast rules about how the State must meet the authentication requirement, and it is permissible to use the content and context of [an item of evidence] for authentication."[12]

(13)   Detective Nolan provided testimony sufficient to support a finding that the videos were what the State purported them to be—that is, surveillance footage from inside and outside Crown Pizza on the night of the shooting and the previous night.  He testified that, although officers who had responded to the scene on the

---

[7] *Id.*

[8] *Id.*

[9] Del. Unif. R. Evid. 901(a).

[10] *Prince v. State*, 284 A.3d 713, 2022 WL 4126669, at *3 (Del. Sept. 9, 2022) (TABLE) (internal quotations omitted).

[11] *White v. State*, 258 A.3d 147, 155 (Del. 2021) (internal quotations omitted).

[12] *Id.* (alteration, internal quotations, and citation omitted).

night of the shooting had retrieved surveillance videos, he later went to Crown Pizza and downloaded his own copy of the videos, which he provided to the Department of Justice.[13]  He described where the cameras were located and testified that the outside videos depicted the corner of Northeast Boulevard and East 27th Street and the side of the Crown Pizza building and sidewalk on East 27th Street.[14]  Detective Nolan explained that the timestamp on the videos was one hour behind the actual time, as corroborated by the time that the 911 call was received.[15]  He also identified Reams on the videos.[16]

(14)  McKnight has not pointed to any circumstances or characteristics of the videos suggesting that they were not what they were purported to be, and we find no plain error as to the authentication issue.[17]  In light of that conclusion, we also find no prosecutorial misconduct in connection with the videos' admission.  Moreover, because Detective Nolan testified that the timestamp on the videos was one hour

---

[13] Appendix to Opening Brief at A303-06, A324-25.

[14] *Id.* at A307-08, A311, A317, A319-21.  Detective Nolan also testified that he learned from Crown Pizza staff that the camera on the side of the building was motion activated.  *Id.* at A313.

[15] *Id.* at A305-07, A325.

[16] *Id.* A317.

[17] *Cf. Bowers v. State*, 307 A.3d 977, 2023 WL 6938238, at *3 (Del. Oct. 20, 2023) (TABLE) (holding that the Superior Court did not abuse its discretion by determining that bystander's cell-phone video was sufficiently authenticated by officer's testimony); *Prince*, 2022 WL 4126669, at *3 (stating that the defendant had "not raised any actual challenge to the authenticity of the Maryland shooting video" for which a law enforcement officer provided authentication testimony, and concluding that the defendant did not establish that defense counsel was ineffective for not raising an authentication objection).

behind the actual time, the prosecutor did not, as McKnight contends, engage in misconduct by describing the time discrepancy during opening statements.

(15)  McKnight also argues that the Superior Court erred by permitting a police officer to identify McKnight in Crown Pizza surveillance videos from the night before the shooting, over McKnight's objection.  Approximately two weeks before trial, the State notified the court that it intended to offer police officer testimony identifying McKnight and other suspects in some of the Crown Pizza videos.  The State requested a hearing to allow the State to establish the proper foundation for the testimony.[18]

(16)  After jury selection, but before opening statements, the court held the requested hearing outside the jury's presence.  Wilmington Police Officer Anthony Lerro testified that he had interacted with McKnight, face-to-face, "more than five to ten times," including during pedestrian stops, and that he had observed McKnight in public but not personally interacted with him another "ten or more times."[19]  He stated that he had had the opportunity to hear McKnight's voice and to observe McKnight's facial features and other physical features.[20]  Officer Lerro provided

---

[18] *See Saavedra v. State*, 225 A.3d 364, 380-81 (Del. 2020) ("Before a law enforcement witness uses a video clip or photograph to identify the defendant, due caution should be exercised to ensure that a proper foundation is laid establishing, to the trial court's satisfaction, that the witness has a special familiarity with the defendant that would put him in a better position than the jury to make the identification.").

[19] Appendix to Opening Brief at A140-41.

[20] *Id.* at A141.

similar testimony with respect to two of the other suspects, Arkye Matthews and Andre Sharpe,[21] and stated that he had seen McKnight, Matthews, and Sharpe together in Riverside.[22] Officer Lerro said that he had never arrested McKnight and that the interactions generally involved groups of people engaged in loitering.[23] He stated that officers would gather the individuals' names, "run them through DELIJIS . . . to confirm who they are," and then send them on their way.[24]

(17)  Reviewing several clips of the Crown Pizza videos from the night of the shooting and the previous night, Officer Lerro identified the person wearing the sweatshirt with the green logo as McKnight and the person wearing the "Carry" sweatshirt as Sharpe; he stated that he recognized them "immediately" when he first saw the footage.[25] Officer Lerro also reviewed videos from the night of the shooting and identified the person wearing the sweatshirt with a yellow Nike logo, blue sneakers, and no mask as Matthews, stating that he recognized him "immediately" when he first saw the footage.[26]

---

[21] *Id.* at A142-45.

[22] *Id.* at A145.

[23] *Id.* at A145, A168-69.

[24] *Id.* at A169.

[25] *Id.* at A147-51, A159-64.  As discussed below, when testifying before the jury, Officer Lerro was not asked to identify anyone who was wearing a mask in the videos from the night of the shooting, which included the suspect alleged to be McKnight.

[26] *Id.* at A152-55.

(18)   Relying, in part, on *Saavedra v. State*,[27] the State argued that Officer Lerro should be permitted to identify McKnight, Sharpe, and Matthews in the video footage.  In *Saavedra*, this Court provided guidance to trial courts considering the admissibility of lay-opinion identification testimony by law enforcement officers. The Court stated that the State should lay a foundation establishing that the witness has a "special familiarity" with the defendant that would put the witness in a better position than the jury to make the identification, and the court should consider "whether the images from which the identification is to be made 'are not either so unmistakably clear or so hopelessly obscure that the witness is no better suited than the jury to make the identification.'"[28]

(19)   The defense argued that Officer Lerro's interactions with McKnight, in the context of the thousands of stops that the officer conducted each year, did not sufficiently establish his "special familiarity" with McKnight.[29]  The defense also argued that the videos were "very clear,"[30] such that identification should be left to the jury.

(20)   After recessing for the night, the court gave a bench ruling on admissibility, concluding that Officer Lerro's identification testimony would be

---

[27] 225 A.3d 364 (Del. 2020).

[28] *Id.* at 380-81 (citations omitted) (quoting *United States v. Jackman*, 48 F.3d 1, 4-5 (1st Cir. 1995)).

[29] Del. Unif. R. Evid. 701; *Saavedra*, 225 A.3d at 380.

[30] Appendix to Opening Brief at A191.

permitted, with a limiting instruction. After carefully considering Rule 701 of the Delaware Uniform Rules of Evidence, this Court's decisions on the issue, and several decisions from other jurisdictions discussed in our case law, the court determined that the State had sufficiently established Officer Lerro's "special familiarity" with McKnight and that the videos were not "so unmistakably clear or so hopelessly obscure" that Officer Lerro would be no better suited than the jury to identify McKnight in the videos.[31]

(21) Before Officer Lerro testified, the court instructed the jury as follows:

> Officer Lerro is an officer with the Wilmington Police Department, and what you are about to hear is testimony bearing on an issue in this case concerning identification. Officer Lerro is going to testify concerning individuals who are depicted in some of the clips you've already seen. And you should understand that this—these identifications are in the form of Officer Lerro's opinion as to the identity of those individuals.
>
> You are the sole and exclusive judges of the facts of the case and the credibility of a witness, and I want to remind you that you should give this officer's opinion as to the identifications only such weight as you find it deserves, and you should consider whether the Defendant and other people have been accurately identified based on the totality of the circumstances bearing upon that issue of identification.
>
> Officer Lerro will testify that he had prior observations or interactions with individuals depicted in the video clips. You should also understand and not draw any adverse inferences about these interactions because no arrests or investigations were ever involved in those interactions, so that they did not result in criminal charges against anybody. They were just routine interactions.[32]

---

[31] *Id.* at A205-12.
[32] *Id.* at A338-39.

(22) Officer Lerro's testimony to the jury began with the background information as to how he was familiar with Sharpe, Matthews, and McKnight and that he had previously seen them together in Riverside. He also identified McKnight in the courtroom.[33] Officer Lerro then identified the person wearing the sweatshirt with the green logo in several of the videos from the night before the shooting as McKnight.[34] He also identified the person wearing the "Carry" sweatshirt in those same videos as Sharpe.[35] Officer Lerro was not asked to identify anyone who was wearing a mask in any videos from the night of the shooting, which included the individuals wearing the sweatshirt with the green logo and the "Carry" sweatshirt.[36]

(23) We review a trial court's decision on the admissibility of evidence for abuse of discretion.[37] "An abuse of discretion occurs when a court has exceeded the

---

[33] *Id.* at A341-45.

[34] *Id.* at A345-47 (video identified as channel 15, dated June 20, 2022, and timestamped 11:21:18 p.m.); *id.* at A348 (video identified as channel 7, dated June 20, 2022, and timestamped 11:21:49 p.m.); *id.* at A349-50 (video identified as channel 14, dated June 20, 2022, and timestamped 11:21:49 p.m.); *id.* at A350-51 (video identified as channel 10, dated June 20, 2022, and timestamped 11:21:59 p.m.).

[35] *Id.* at A346-48, A348-49, A350, A350-51.

[36] In two videos from the night of the shooting, Officer Lerro did identify the person wearing the sweatshirt with the yellow Nike logo, blue sneakers, and no mask as Matthews. *Id.* at A351-52.

[37] *Hines v. State*, 248 A.3d 92, 99 (Del. 2021); *see also Torres v. State*, 2024 WL 4541918, at *3 & n.22 (Del. Oct. 22, 2024) (reviewing trial court's decision to allow officer-identification testimony for abuse of discretion and rejecting defendant's argument that Court should apply a *de novo* standard because he contended that admission of the testimony violated his due-process rights by invading the province of the jury).

13

bounds of reason in light of the circumstances, or so ignored the recognized rules of law or practice so as to produce injustice."[38]

(24) Rule 701 sets forth the standard for admission of lay opinion testimony. It provides:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
> (a) rationally based on the witness's perception;
> (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
> (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.[39]

(25) Although Rule 701 permits a lay witness to testify about his own impressions when they are based on personal observation, the ultimate question of identity remains one for the jury to decide.[40] When a jury can readily draw the necessary inferences and conclusions without the aid of the witness's opinion, lay opinion testimony is not helpful to a jury and should not be admitted under Rule 701.[41] In *Thomas v. State*, we expressed "serious reservations" about the admission of lay-opinion identification testimony by a law enforcement officer, finding it "unclear" that an officer's testimony "would be helpful to the factfinder in resolving an identification issue."[42] Then, the following year, we provided the guidance set

---

[38] *Heald v. State*, 251 A.3d 643, 656 (Del. 2021) (internal quotations omitted).

[39] Del. Unif. R. Evid. 701.

[40] *Thomas v. State*, 207 A.3d 1124, 2019 WL 1380051, at *3 (Del. Mar. 26, 2019) (TABLE).

[41] *Torres*, 2024 WL 4541918, at *4.

[42] *Thomas*, 2019 WL 1380051, at *3.

forth in *Saavedra*.[43]  Since then, several of this Court's decisions have affirmed the Superior Court's application of *Saavedra*.  For example, in *Biddle v. State*, we affirmed the trial court's determination that an officer's face-to-face, conversational interactions with the defendant on eight to ten occasions were sufficient to establish special familiarity and that the images from which the identification would be made were in the "buffer zone" between being "abundantly clear" and "hopelessly obscure," such that the officers' testimony would not run afoul of this Court's instructions.[44]

(26)  The Superior Court did not abuse its discretion by allowing Officer Lerro to identify McKnight.  The court considered and faithfully applied our decisions relating to lay-opinion identification testimony by law enforcement officers.  Officer Lerro's foundation testimony was sufficient to establish his

---

[43] In *Saavedra* we wrote:
> Before a law enforcement witness uses a video clip or photograph to identify the defendant, due caution should be exercised to ensure that a proper foundation is laid establishing, to the trial court's satisfaction, that the witness has a special familiarity with the defendant that would put him in a better position than the jury to make the identification.  And in determining whether the witness occupies such a position, the court should also consider whether the images from which the identification is to be made "are not either so unmistakably clear or so hopelessly obscure that the witness is no better suited than the jury to make the identification."

225 A.3d at 380-81 (citations omitted) (quoting *Jackman*, 48 F.3d at 4-5).

[44] 302 A.3d 955, 2023 WL 4876018, at *2, *7 (Del. July 31, 2023) (TABLE); *see also Torres*, 2024 WL 4541918, at *4 (holding that Superior Court "heeded our concerns regarding lay-opinion identification testimony by law enforcement and properly applied our guidance" as set forth in *Biddle*, *Saavedra*, and *Thomas*, where officer had "about a dozen interactions" with the defendant, including one that lasted "a couple of hours" and the images at issue were not "unmistakably clear" because a hat covered part of the person's head and showed "a good part," but not all, of the person's face).

15

"special familiarity" with McKnight. As the Superior Court acknowledged, the videos in which Officer Lerro identified McKnight were at the higher end of the clarity spectrum for surveillance videos, but we cannot conclude that the court abused its discretion by finding that they were within the "buffer zone" within which lay-opinion testimony is permissible. Moreover, only Officer Lerro provided lay-opinion identification testimony at trial, although more than one officer apparently identified McKnight in the videos during the investigation, and he identified McKnight in videos from the night before the shooting, when McKnight was not engaged in any wrongdoing, and not in the videos from the night of the shooting.[45] Finally, the court gave an appropriate limiting instruction.

(27) We have carefully reviewed the record and conclude that McKnight's appeal is wholly without merit and devoid of any arguably appealable issue. We also are satisfied that McKnight's counsel has made a conscientious effort to examine the record and has properly determined that McKnight could not raise a meritorious claim in this appeal.

---

[45] In *Biddle*, several officers identified the defendant in surveillance footage that appeared to capture the crime itself. 2023 WL 4876018, at *1, *3. In *Thomas*, a detective identified the defendant in a surveillance video from near the scene of the crime, captured within minutes of the crime. 2019 WL 1380051, at *1.

16

NOW, THEREFORE, IT IS ORDERED that the judgment of the Superior Court is AFFIRMED.  The motion to withdraw is moot.


BY THE COURT:

*/s/ Abigail M. LeGrow*
Justice