IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CAPICE JOHNSON, | § | |
| | § | No. 320, 2024 |
| Defendant Below, | § | |
| Appellant, | § | Court Below: Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | Cr. ID No:   2208005712A (N) |
| STATE OF DELAWARE, | § | |
| | § | |
| Appellee. | § | |
| | § | |

Submitted:  May 14, 2025
Decided:    July 14, 2025

Before **TRAYNOR**, **LEGROW**, and **GRIFFITHS**, Justices.

Upon appeal from the Superior Court of the State of Delaware.  **AFFIRMED.**

Nicole M. Walker, Esquire, OFFICE OF THE PUBLIC DEFENDER, Wilmington, Delaware, *for Appellant Capice Johnson*.

Andrew J. Vella, Esquire, DELAWARE DEPARTMENT OF JUSTICE, Wilmington, Delaware, *for Appellee State of Delaware*.

**TRAYNOR**, Justice:

Capice Johnson was convicted of attempted murder in the first degree, reckless endangering in the first degree, and two counts of possession of a firearm during the commission of a felony ("PFDCF"). He was sentenced to 75 years of Level V incarceration, suspended after 30 years for probation.[1] At trial, the State's key witness was a police detective who provided testimony while surveillance video was played to the jury. Johnson challenges his convictions, contending that the trial judge plainly erred when he failed to instruct the jury *sua sponte* that it need not accept the police officer's narration of the surveillance footage as true and could make its own determination of what was shown in the surveillance footage. For the reasons set forth below, we affirm.

I

This case involves a drive-by shooting in Middletown, Delaware. We derive the following facts from the trial record.

A

At around 7:00 p.m. on August 9, 2022, Siyona Jones and Thomas Haye were standing outside a home at 77 Cole Boulevard in Middletown. A masked man riding an orange and black dirt bike stopped in front of the home. He pulled a handgun

---

[1] The duration of these sentences was enhanced by the Superior Court's grant of the State's motion to declare Johnson a habitual offender under 11 *Del. C.* § 4214(d).

from a cross-body bag and fired at least 17 shots at Jones and Haye before fleeing. The pair ran for cover, but Jones was struck by multiple shots, leaving her critically injured.[2] Haye, who had ducked for cover behind Jones's black Honda CRV parked in the driveway, was unharmed.

A husband and wife in a passing car called 911. They reported that a man wearing a white t-shirt riding a blue motorcycle was acting as a lookout, while another man wearing a mask and riding an orange motorcycle "unloaded a clip" into a home.[3] They described the color of a handgun used in the shooting as "coyote brown."[4] Detective Joshua Stafford of the Middletown Police Department, the on-call detective that evening, arrived at the scene shortly after the 911 call was placed.

Stafford's investigation quickly established Johnson as a suspect. Footage from a surveillance camera that captured the shooting in its entirety showed the shooter riding an orange dirt bike, dressed in a white t-shirt, dark shorts with a printed pattern, a cross-body bag, and black sneakers. Surveillance video of another home, 36 Cole Boulevard, from five days before the shooting showed a man on an orange dirt bike stopping at the home and walking inside, before emerging while using a red cell phone. The house at 36 Cole Boulevard belonged to the parents of

---

[2] A forensic nurse who later examined Jones testified at trial that Jones lost over half the total volume of blood in her body because of her injuries and that Jones certainly would have died absent medical intervention. App. to Opening Br. at A129–30, A149.

[3] State's Ex. 1.

[4] *Id.*

Jasmine Morgan, who has two children with Johnson. The same camera also captured footage of the black Honda CRV owned by Jones stopping outside 36 Cole Boulevard two days before the shooting. Footage of Johnson's home at 967 Janvier Court depicts a man wearing a white t-shirt and patterned shorts leaving and arriving at the home in cars registered to Ashley Skinner, Johnson's roommate, on the day of the shooting.

Police obtained an arrest warrant for Johnson on August 11, two days after the shooting. Johnson was arrested a few weeks later. A search of his home yielded two cell phones, one of which was red. A search of the cell phones revealed numerous images of Johnson sitting on an orange dirt bike, a video of the shooting taken by a witness, a photo of a gloved hand holding a bronze-colored handgun, a photo of Johnson wearing black-and-yellow sneakers, and in another holding a red cell phone. Screenshots taken from an Instagram profile associated with Johnson also showed an orange dirt bike nearly indistinguishable from the one shown in surveillance tapes.

Johnson was charged with attempted murder in the first degree, reckless endangering in the first degree, two counts of PFDCF, and one count of carrying a concealed deadly weapon without a license ("CCDW").

A two-day jury trial was held in October 2023. Johnson's defense strategy was to sow reasonable doubt that the man in the video of the shooting was in fact him. In his opening statement, Johnson's trial counsel explained that the facts of the shooting, other than the identity of the shooter, were undisputed:

> . . . Siyonna Jones was the victim of a shooting on August 9 last year. The shooter was operating an orange dirt bike, wearing shorts and a mask.
> The State, as you just saw, has developed a case where they believe that the defendant is the shooter. We contend that they are mistaken, that there's insufficient evidence to claim that he is the shooter.[5]

To support its claim that Johnson was the shooter, the State called Detective Stafford to testify four separate times during the trial. During Stafford's testimony, the State played for the jury the surveillance footage of the shooting, of Johnson's apartment on the day of the shooting, and of the house at 36 Cole Boulevard on August 4 and 7, 2022. At various intervals, the State paused the footage and asked Stafford what was occurring on screen. Stafford's testimony consisted of descriptions of what was occurring in each video.

The first exchange occurred during the publication of the video of the shooting:

> Q. Okay. Now, who's that individual in the white T-shirt in front of that house?

---

[5] App. to Opening Br. at A63–64.

A. That's Thomas Haye.

Q. Okay. What's he wearing?

A. He has a white tank top and dark-colored shorts.

Q. How do you know that it's Thomas Haye?

A. I interviewed him later that day.

Q. Okay.

(The video is continued.)

Q. All right. I am going to stop it here. We're at about 55 seconds. So we just saw two bikes go by. And if we need to go back, let me know, but which went first, the blue bike or the orange bike?

A. The blue bike.

Q. Okay. Now, did you see the rider of the orange bike do anything as he rode by 77 Cole Boulevard?

A. Yes. It appeared that he looked back, and it looked like he made some motion with his hand and continued. He was driving, riding west, and continued to look back towards the area of Thomas Haye and 77 Cole Boulevard.

Q. All right. Now, as the video stands here at 55 seconds, can you see anyone that's outside of 77 Cole in between those vehicles there?

A. Yes, I can.

Q. Okay. And who is there?

A. It's Thomas Haye and Siyonna Jones.

Q. All right. And where are they standing with relationship to that black vehicle and the white vehicle?

6

A. They are right in between both of them.

Q. Okay.

A. I think.

. . .

Q. Okay. Well, now we see the shooter with a firearm in their hand. Did you see where it came from?

A. Yes. The shooter pulled the firearm out of the bag, the cross-body bag.[6]

Stafford then testified while the State played the surveillance footage from outside Johnson's home at noon on the day of the shooting:

Q. And who or what did you observe at that time?

A. So what I observed was a male exit the residence wearing a white T-shirt and has a cross-body bag on their person. You can see in this image still -- it's a little difficult to see. When we play it, you'll be able to see -- and the strap is over the left shoulder. Also, the individual is wearing shorts, and it appears to have some type of pattern to those shorts.

Q. All right. We'll keep playing the video here.

(The video is continued.)

. . .

Q. All right. I've paused the video here at 20 seconds. What can you see there?

A. You can see that cross-body bag that I was just describing over this individual's left shoulder as well as him wearing a white T-shirt.

---

[6] *Id.* at A78–79.

7

Q. What kind of a vehicle is he getting into here?

A. He's getting into a Chevy Cruze. It's a black Chevy that's registered to Ashley Skinner.

Q. All right. How do you know that?

A. Through our investigation, we saw the vehicle in the area parked there numerous times, and the registration was registered to her.[7]

The State then published the surveillance footage of Johnson's home from later that evening and continued its examination of Stafford:

Q. What do we see at this time?

A. So a short time later, at about 9:06, we see a black Jeep Cherokee with temporary tags enter the apartment complex.

Q. Who is that vehicle registered to?

A. That vehicle is also registered to Ashley Skinner.

Q. Okay. Now, during your time investigating this case, did you ever observe the defendant in control of any vehicles, or did other investigators?

A. Yes.

Q. Okay. And what vehicles was he associated with?

A. This black Jeep Cherokee.

Q. All right. I will resume the video.

(The video is further published.)

---

[7] *Id.* at A154–55.

THE WITNESS: So you see that female exits the apartment and begins walking over to where the Jeep was parked. A male then exits the Jeep and meets with this female and there's a bag exchanged. The vehicle then leaves the area.[8]

Finally, the State showed the August 4 and August 7 surveillance footage from 36 Cole Boulevard. When asked what he could see in the August 4 footage, Stafford said:

> So, again, this male has a black mask on, a black T-shirt, and black pants. And it's a little difficult with this resolution with it paused, but he also has a cross-body bag on, again. And if you take particular note of the sneakers, they are black and yellow sneakers.
> And then you also see the individual walking around here in a second, if we can move forward, talking on a cell phone. You'll notice it's a red cell phone.[9]

And Stafford testified that the black Honda CRV shown in the August 7[10] footage belonged to Jones and was "the vehicle that we saw was shot."[11]

Notably, Stafford was never asked to identify Johnson in any of the surveillance footage. Nor did any of his testimony draw an objection from defense counsel except for when the State asked Stafford to explain "the residents' reaction" after the black CRV stopped at 36 Cole Boulevard on August 7. The State withdrew this question.

---

[8] *Id.* at A158–59.
[9] *Id.* at A161–62.
[10] The opening brief suggests that this footage is from August 9. A review of the trial transcript shows it was taken on August 7. Opening Br. at 15; App. to Opening Br. at A163.
[11] App. to Opening Br. at A163.

The State also introduced the images taken from Johnson's cell phones and Instagram account. This evidence included dozens of images of an orange dirt bike that was nearly indistinguishable from the one used during the shooting, a photo of Johnson wearing black and yellow sneakers, photos of Johnson holding a red cell phone, and a photo of a gun that matched the description of the weapon given in the 911 call immediately following the shooting.

Johnson did not request, nor was the jury presented with, a limiting instruction concerning Stafford's testimony. The jury was, however, instructed that "you are the sole judges of the facts. You, and only you, will decide what happened."[12] The jury also received a standard instruction informing it that it was the sole judge of witness credibility.

Johnson was convicted on all counts except the CCDW count. As mentioned above, he was sentenced to 75 years of incarceration suspended after 30 years for probation. This appeal followed.

## C

As will be more fully developed below, Johnson claims that the trial judge erred by failing to provide *sua sponte* an instruction to the jury informing it that it did not have to take as fact the narration provided by Detective Stafford—the State's lead witness—during the playing of surveillance footage of the shooting, the

---

[12] *Id.* at A331.

surveillance footage of Johnson's apartment on the day of the shooting, and the surveillance footage taken of 36 Cole Boulevard on August 4 and 7, 2022. Johnson argues that Stafford's testimony should have been treated as lay-opinion identification testimony under D.R.E. 701. Accordingly, Johnson claims that the trial judge should have given a limiting instruction because, without one, Stafford could "merely tell the jury what result to reach."[13]

## II

Johnson concedes that at trial he did not request the instruction that he now contends was necessary. When a defendant does not request a jury instruction, we review the Superior Court's failure to provide that instruction *sua sponte* for plain error.[14] To amount to plain error, "the error complained of must be so clearly prejudicial as to substantial rights as to jeopardize the fairness and integrity of the trial process."[15] Our review is limited to material defects that are "apparent on the face of the record; which are basic, serious and fundamental in their character, and which clearly deprive an accused of a substantial right, or which clearly show

---

[13] Opening Br. at 20 (quoting *United States v. Garcia*, 413 F.3d 201, 214 (2d Cir. 2005)) (internal quotation marks omitted).
[14] *Strickland v. State*, 328 A.3d 286, 292 (Del. 2024).
[15] *Wainwright v. State*, 504 A.2d 1096, 1100 (Del. 1986).

manifest injustice."[16]  This means that an alleged defect "must have affected the outcome of the trial."[17]

## III

Johnson does not argue that Stafford's testimony was inadmissible.  He instead contends that, because his case is analogous to our line of precedent analyzing lay-opinion identification testimony by police officers, the trial court's failure to provide a limiting instruction was plainly erroneous.  We are unpersuaded by this argument.

## A

In *Thomas v. State*, we cautioned that judges should be mindful that determinations of identity remain questions of fact reserved for the jury.[18]  We also stated that "[i]t is unclear to us how the testimony of a police officer—or any other witness without a particular expertise in comparing a videographic representation of a person with a suspect or defendant—would be helpful to the factfinder in resolving an identification issue."[19]  Later, in *Saavedra v. State*, we held that to be admissible, lay-opinion identification testimony requires that

---

[16] *Id.*
[17] *Hastings v. State*, 289 A.3d 1264, 1271 (Del. 2023) (quoting *Buckham v. State*, 185 A.3d 1, 19–20 (Del. 2018)) (internal quotation marks omitted).
[18] *Thomas v. State*, 207 A.3d 1124, 2019 WL 1380051, at *3 (Del. Mar. 26, 2019) (TABLE).
[19] *Id.*

12

a proper foundation is laid establishing, to the trial court's satisfaction, that the witness has a special familiarity with the defendant that would put him in a better position than the jury to make the identification. And in determining whether the witness occupies such a position, the court should also consider whether the images from which the identification is to be made "are not either so unmistakably clear or so hopelessly obscure that the witness is no better suited than the jury to make the identification."[20]

Johnson argues that Stafford's testimony is "opinion" that warrants the same heightened caution we have urged when the State seeks to introduce lay-opinion identification testimony. But this case is different. Stafford was never asked to identify Johnson in the video, nor was he asked to provide any other lay-opinion testimony that would bring to bear the concerns we expressed in *Thomas*, *Saavedra*, and other cases involving lay-opinion testimony by police officers.[21] Even when prompted by the State to describe some of his observations from one of the videos as "characteristics that suggest [the person in the video] may have been [Johnson][,]" Stafford responded, "[f]rom my understanding that's for the jury to decide."[22] Stafford's testimony was limited to providing a neutral explanation for the jury of what he saw in each video.

---

[20] *Saavedra v. State*, 225 A.3d 364, 380–81 (Del. 2020) (quoting *United States v. Jackman*, 48 F.3d 1, 5 (1st Cir. 1995)).

[21] *E.g.*, *Biddle v. State*, 302 A.3d 955, 2023 WL 4876018 (Del. July 21, 2023) (TABLE); *Torres v. State*, 329 A.3d 502, 2024 WL 4541918 (Del. Oct. 22, 2024) (TABLE).

[22] App. to Opening Br. at A180.

In *Saavedra*, we noted that this sort of narrative testimony is permissible. Specifically, we stated that "we do not condone the use of narrative testimony during a video presentation to a fact finder *beyond what is necessary to lay the foundation for the video's admission and to present an uncontroversial explanation of what the video depicts*."[23] Stafford's testimony was merely an uncontroversial explanation of what the surveillance footage depicted. He was asked to describe what he saw on screen and, at times, asked to provide context with information he had uncovered during the investigation. For example, he was asked to identify the black Honda CRV in the video taken at 36 Cole Boulevard and explain that it was registered to Jones. This is not opinion testimony. Stafford was simply asked to describe facts of which he had personal knowledge through his work on this case.

Johnson suggests, relying on a case from a New Jersey court, that the jury should have been instructed that "it is your function to determine what [or who] is depict[ed] in the video, and whether the video or any portion of it is credible."[24] The jury was already properly instructed, however, that "you are the sole judges of the

---

[23] *Saavedra*, 225 A.3d at 375 (emphasis added).

[24] Opening Br. at 19 (quoting *State v. King*, 2022 WL 2289044, at *19 (N.J. Super Ct. App. Div. June 24, 2022)). In *King*, the court found only that the trial court in that case had permitted lay-opinion identification testimony by police that was inadmissible outright and that an instruction of this nature would not cure that defect in the trial process. *King*, 2022 WL 2289044 at *19. The *King* court did not address whether such an instruction is necessary whenever a jury hears narration testimony by a police officer.

facts. You, and only you, will decide what happened."[25] Moreover, the jury received

a standard witness credibility instruction, informing it that:

> You are the sole judges of credibility of each witness and of the weight to be given to the testimony of each. You should take into consideration each witness's means of knowledge, strength of memory, and opportunity for observation; the reasonableness or unreasonableness of the testimony; the consistency or inconsistency of the testimony; the motivations of the witness; the fact, if it is a fact, that the testimony has been contradicted; the bias, prejudice, or interest of the witness, if any; the manner or demeanor of the witness on the stand; and any other fact or circumstance shown by the evidence that affects the credibility of the testimony.[26]

Because the jury was properly instructed that it was the sole judge of the facts,

and because the concerns animating our caution regarding lay-opinion identification

testimony in *Thomas* and *Saavedra* are not present here, we are not convinced that

the trial judge erred by failing to *sua sponte* provide a limiting instruction.

B

But even if we were to conclude that the failure to give a limiting instruction

was error, it would not rise to the level of plain error. As discussed above, to be

reversible under plain-error review, "the error complained of must be so clearly

prejudicial as to substantial rights as to jeopardize the fairness and integrity of the

---

[25] App. to Opening Br. at A331.
[26] *Id.* at A345.

15

trial process."[27] This means that the alleged defect "must have affected the outcome of the trial."[28]

Here, the jury received an instruction that it was the sole arbiter of the facts. And Stafford's testimony was limited to an "uncontroversial explanation"[29] of what he observed in each surveillance video. For Johnson's argument to succeed, taking for example the testimony considered to be "of greatest importance"[30] by Johnson in his opening brief, we must be convinced that a jury given a limiting instruction, after hearing Stafford's testimony and simultaneously viewing the video and enlarged stills from that video showing an individual with a red cell phone, might actually conclude that the cell phone was not red. This would need to be true for several factual findings sufficient to undermine our confidence in the jury's verdict. That outcome—and the idea that jurors might choose not to believe their own eyes if provided with a limiting instruction—seems implausible.

As a final matter, Johnson does not contend that the surveillance footage itself, nor any of the evidence recovered from his cell phones, was inadmissible. The evidence from his cell phones included copies of eyewitness videos of the aftermath of the shooting, images of an orange dirt bike, and an image of a gun matching the

---

[27] *Wainwright*, 504 A.2d at 1100.
[28] *Hastings*, 289 A.3d at 1271 (quoting *Buckham*, 185 A.3d at 19–20) (internal quotation marks omitted).
[29] *Saavedra*, 225 A.3d at 375.
[30] Opening Br. at 15.

16

description given in the 911 call. Combined with the raw images from the surveillance footage, the weight of this evidence was overwhelming. It seems unlikely, if not impossible, that the jury would have reached a different outcome even if it had been given a limiting instruction concerning Stafford's narration testimony. Thus, the failure to give a limiting instruction does not rise to the level of plain error.

## IV

We affirm the Superior Court's judgment and Johnson's convictions.